[Crim. No. 2805.   Fourth Dist., Div. One.   Sept. 11, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLEY
BERNAL, Defendant and Appellant.

J. Perry Langford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M: George, Deputy Attorney General, for Plaintiff and Respondent.

LAZAR, J. pro tem.*—Defendant appeals from a judgment of conviction of possession of marijuana in violation of Health and Safety Code, section 11530, after trial before a jury. The information filed also charged defendant with a prior conviction of a felony which defendant admitted. Because of the limited nature of the contentions made upon appeal, we set forth only those facts essential to their consideration.

On the morning of July 3, 1966, about 2 a.m., defendant was arrested as he sat in his Thunderbird automobile waiting for a traffic light to change in the downtown area of San Diego. The evidence of defendant's guilt consisted of testimony that he was smoking an apparent hand-rolled cigarette and cupping his face and holding his nose in a manner customary to marijuana users; when the car door was opened for defendant to get out, a strong odor of marijuana smoke was apparent; on the floor a matchfolder with a charred area was found which was warm; it is customary to keep partially smoked marijuana cigarettes in such a matchfolder; another matchfolder with two partially burned but cold marijuana cigarettes was found in the console between the two front seats of the Thunderbird. Defendant concedes the sufficiency of the evidence to support the conviction if the trial court did not commit error or if committed error was harmless or not prejudicial.

Defendant testified in his own behalf, and denied smoking marijuana at the time in question and denied having any in his car.

The contentions of the defendant require that we set out at length the testimony of defendant's brother, Alex Bernal, who was called as a witness by defendant.

"THE CLERK: Take the stand, Mr. Bernal. State your full name and be seated, please.

---

*Assigned by the Chairman of the Judicial Council.

"Mr. Hughes: Your Honor, my name is Peter Hughes. I am a member of the San Diego bar and I represent the witness Bernal who has just been sworn, and I would like to remain in attendance and advise him of his rights. I think—

"The Court: Mr. Hughes is your attorney, Mr. Bernal?

"The Witness: Yes.

"The Court: Very well, you may do so, Mr. Hughes, and you may participate to such extent as you feel it necessary to the protection of your client.

"Mr. Hughes: Thank you, your Honor.

"DIRECT EXAMINATION

"By Mr. Langford:

"Q. Mr. Bernal, do you recognize the gentleman sitting at the left of me? A. Yes.

"Q. Who is he? A. My brother.

"Q. And what is his name? A. Charles Bernal.

"Q. Where are you staying at the present time? A. In the county jail.

"Q. How long have been been there? A. Almost a month now.

"Q. Why are you there? A. Sale of marijuana and possession—not possession, sales.

"Q. Over what period of time were you accused of selling marijuana?

"Mr. Gill: Object to as immaterial.

"The Court: Overruled. I take it this is preliminary.

"Mr. Langford: Yes, your Honor.

"The Court: The objection will be overruled. Over what period of time were you accused of selling marijuana?

"The Witness: Quite a few months.

"By Mr. Langford:

"Q. Well, starting when? A. Oh, around June, July.

"Q. Does your brother Charley have an automobile? A. Yes.

"Q. What sort of an automobile is it? A. '59 Thunderbird.

"Q. What color? A. Blue.

"Q. Did he have it in July of this year? May I withdraw that question? Wait a minute. Can you answer the question? A. I don't know how long he has had it. I mean—

"Q. Do you know when he was arrested? A. Today? The day?

"Q. No. Do you remember when he was—

"The Court: The occasion——

"Mr. Gill: Objection——

"The Witness: Yes.

"Mr. Gill: ——as being ambiguous. He may have been several times.

"The Court: It is not ambiguous. The occasion of his arrest. Do you remember that?

"The Witness: Yes.

"By Mr. Langford:

"Q. Did he have the automobile before he was arrested? A. You mean before he was picked up?

"Q. Yes. A. No.

"Q. You know that your brother Charley is accused of possession of marijuana, don't you? A. Yes.

"Q. You know that he is accused of possessing marijuana in an automobile. A. Yes.

"Q. Is it this blue Thunderbird? A. That he is accused?

"Q. That he is accused of possession of marijuana in. A. Yes.

"Q. Then he had the blue Thunderbird at the time he was arrested for possessing marijuana, didn't he? A. Yes.

"Q. Before he was arrested for possessing this marijuana did you ever drive the blue Thunderbird? A. Yes.

"Mr. Hughes: Your Honor, I would ask that answer be stricken. I would advise you to refuse to answer that question on the ground that it may tend to incriminate you.

"The Court: The answer may be stricken. The objection will be sustained.

"Ladies and gentlemen of the jury, when an answer is stricken you treat it as though you had not heard it and, of course, you draw no inference from the question itself.

"By Mr. Langford:

"Q. Did you ever possess marijuana in that blue Thunderbird? A. I refuse to answer that question because I honestly believe that answer may tend to incriminate me.

"Mr. Langford: I have nothing further of this witness.

". . . . . . . . . .

"The Court: Just a minute, gentlemen, I may want to give the jury an instruction. I want to think about that.

"Ladies and gentlemen of the jury, it is the Court's order that all of the testimony just given by the witness who was on the stand be stricken. It will be stricken from the record and you will consider in your deliberations in this case the same as though you had not heard this last witness testify at all."

Defendant's first contention is stated in these terms:

"The trial court erred in striking the testimony of Alex Bernal, because his testimony, including his claim of the privilege against self-incrimination, was relevant, admissible evidence in support of an inference that he, rather than appellant, was the possessor of People's Exhibit 2, the only usable quantity of contraband introduced in evidence in the case at bar."

Two questions are suggested by this contention. The first is whether the trial court properly allowed the witness Alex to withdraw his answer admitting use of defendant's automobile for the purpose of claiming his privilege against self-incrimination. The second and basic question is the effect to be given to the witness' claim of the privilege against self-incrimination.

Defendant's position as expressed in his brief makes no claim of error in the withdrawal of the answer. The record discloses the answer was given; the witness' counsel requested the striking of the answer and then advised his client not to answer. In summary fashion, a claim of privilege in effect was allowed, although the witness did not actually and personally assert the claim. No objection to the procedure was made by defendant. Under the circumstances the trial court acted within the limits of its discretion in allowing the withdrawal of the answer. There is no sound basis for distinguishing in this regard between a defendant and a witness and it does not appear from the record that the witness had been informed of his privilege against self-incrimination, although represented by counsel. It is true that a defendant represented by counsel waives his privilege not to testify if he voluntarily becomes a witness. (See *People* v. *Kramer,* 227 Cal.App.2d 199 [38 Cal. Rptr. 487]; *People* v. *Glaser,* 238 Cal.App.2d 819, 826 et seq. [48 Cal.Rptr. 427].) A distinction may be made with respect to a witness not a defendant; he has no choice whether to be a witness, hence the question of waiving the privilege does not arise until he answers or refuses to answer a specific question. (See *Ex parte Stice,* 70 Cal. 51, 53 [11 P. 459].) Having in mind the exigencies of trial procedure, we apprehend no error of which defendant may take advantage in the retrospective and delayed claim against self-incrimination. The court acted within its discretionary power to control the introduction of evidence.

We consider secondly the court's action in striking from the record and the consideration of the jury the witness'

claim of privilege against self-incrimination. Defendant contends that he was entitled to have before the jury, for what it was worth, the refusal to answer the question whether the witness had used defendant's Thunderbird. As defendant sees it, the jury would have the right to infer the answer would be yes (as in fact it was), which in turn would permit an inference of guilt upon the part of the witness and possibly result in doubt of defendant's guilt. While questions of remoteness and of consistency of guilt of both defendant and the witness notwithstanding readily pose themselves, we deem the point worthy of more comprehensive analysis.

As with other individual constitutional rights, the privilege against self-incrimination has in recent years been the subject of intensive judicial attention. For state courts a turning point was reached in 1964 with the decision of *Malloy* v. *Hogan*, 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489], when the United States Supreme Court ruled that the Fourteenth Amendment carried the protection against compulsory self-incrimination of the Fifth Amendment into state court proceedings. California, of course, has had its own constitutional provision (art. I, § 13) affording the same right against compulsory self-incrimination, diluted by the concurrent permission authorizing comment on a defendant's failure to testify. Federally, the no-comment rule was founded on statute (see *Wilson* v. *United States*, 149 U.S. 60 [37 L.Ed. 650, 13 S.Ct. 765]) until 1965 with the decision of *Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], in which the court held the Fifth Amendment, independently of statute, forbade comment on a failure to testify in order that enjoyment of the constitutional privilege should be unsullied by direct attack upon its exercise and indirect limitation upon its value. In so deciding, the court ruled squarely against the California rule and practice of permitted comment.

The more recent decisions have found it salutary to examine the nature and extent of the privilege against self-incrimination and to express their findings in both a historical and philosophical framework.

Extended discussion of the privilege against self-incrimination, especially in its historical aspects, is to be found in the dissenting opinion of Judge Frank in *United States* v. *St. Pierre* (2d Cir. 1942) 132 F.2d 837. 840 [147 A.L.R. 240] ). In 1954 in *United States* ex rel. *Belfrage* v. *Shaughnessy*, 212 F.2d 128, 130, it was said that ". . . whatever the underlying motivation, an invocation of the Fifth Amendment is no

ground at all for an inference of guilt or criminal proclivities.''

In *United States* v. *Grunewald* (2d Cir. 1956) 233 F.2d 556, 571, Judge Frank, again by dissenting opinion, considered at length the meaning and effects of the privilege against self-incrimination. The majority opinion had upheld the trial court's instruction to the jury that the defendant's claim of privilege in an earlier grand jury hearing could be considered for the limited purpose of testing the defendant's credibility at the time of trial. After commenting ''For as this court has heretofore said, an inferior court like ours should follow, not resist, a new pronounced doctrinal trend in Supreme Court decisions when considering the precedential force of older Supreme Court decisions'' (p. 576), Judge Frank remarked that those who criticize the Supreme Court protection ''of the Fifth Amendment privilege, overlook the fact that a noble principle often transcends its origins, that creative misunderstandings account for some of our most cherished values and institutions . . .'' (p. 581) and closed with impressive words: ''The foes of the privilege—beginning with Bentham—have mistakenly viewed it solely from a procedural angle; so considered, it seems to them an unjustifiable obstacle to the judicial ascertainment of the truth. They ignore the fact that the privilege—like the constitutional barrier to unreasonable searches, or the client's privilege against disclosure of his confidential disclosures to his lawyer—has, *inter alia,* an important 'substantive' value, as a safeguard of the individual's 'substantive' right of privacy, a right to a private enclave where he may lead a private life. That right is the hallmark of our democracy. The totalitarian regimes scornfully reject that right. They regard privacy as an offense against the state. Their goal is utter depersonalization. They seek to convert all that is private into the totally public, to wipe out all unique 'private worlds,' leaving a 'public world' only, a la Orwell's terrifying book, '1984.' They boast of the resultant greater efficiency in obtaining all the evidence in criminal prosecutions. We should know by now that their vaunted efficiency too often yields unjust, cruel decisions, based upon unreliable evidence procured at the sacrifice of privacy. We should beware of moving in the direction of totalitarian methods, as we will do if we eviscerate any of the great constitutional privileges.'' (Pp. 581-582) And in 1957, Mr. Justice Harlan, writing in *Grunewald* v. *United States,*

353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963, 62 A.L.R.2d 1344], considered directly the question considered earlier by the Second Circuit and held the reliance on the Fifth Amendment could not be used as a test of credibility. The exact question was, of course, concerned with the concept of earlier inconsistent statements and secondly the "far from negligible danger that the jury [would make] impermissible use of the testimony of implicitly equating the plea of the Fifth Amendment with guilt." (*Grunewald* v. *United States, supra,* 353 U.S. 391, 424 [1 L.Ed.2d 931, 954, 77 S.Ct. 963, 984, 62 A.L.R. 2d 1344, 1367-1368].) In relation to the basic meaning of the Fifth Amendment, however, it was said: "We need not tarry long to reiterate our view that, as the two courts below held, no implication of guilt could be drawn from Halperin's invocation of his Fifth Amendment privilege before the grand jury. Recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew that one of the basic functions of the privilege is to protect *innocent* men. Griswold, The Fifth Amendment Today, 9-30, 53-82. 'Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' *Ullmann* v. *United States,* 350 U.S. 422, 426 [100 L.Ed. 511, 518, 76 S.Ct. 497, 500, 53 A.L.R.2d 1008, 1015]. See also *Slochower* v. *Board of Higher Education,* 350 U.S. 551, at pages 557-558 [100 L.Ed. 692 at page 700, 76 S.Ct. 637, at page 641] when, at the same Term, this Court said: 'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.' " (*Grunewald* v. *United States, supra,* 353 U.S. 391, 421 [1 L.Ed.2d 931. 952, 77 S.Ct. 963, 982, 62 A.L.R.2d 1344, 1366].) Mr. Justice Black, in concurring, commented strongly against any adverse use of the exercise of the constitutional privilege in these words: "I agree with the Court that use of this claim of constitutional privilege to reflect upon Halperin's credibility was error, but I do not, like the Court, rest my conclusion on the special circumstances of this case. I can think of no special circumstances that would justify the use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege

deemed worthy of enshrinement in the Constitution.'' (*Grunewald* v. *United States, supra,* 353 U.S. 391, 425-426 [1 L.Ed.2d 931, 955, 77 S.Ct. 963, 984-985, 62 A.L.R. 1344, 1368].) Full expression is given to this analysis in *Murphy* v. *Waterfront Com. of New York Harbor,* 378 U.S. 52 [12 L.Ed. 2d 678, 84 S.Ct. 1594], decided the same term as *Malloy* v. *Hogan, supra,* 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489]. *Murphy, supra,* arose in a case where New Jersey had given immunity to a witness who continued a refusal to testify because of possible incrimination under federal law. Mr. Justice Goldberg gave attention to ''The Policies of the Privilege'' in these words: ''The privilege against self-incrimination 'registers an important advance in the development of our liberty— ''one of the great landmarks in man's struggle to make himself civilized.' ' *Ullmann* v. *United States,* 350 U.S. 422, 426 [100 L.Ed. 511, 518, 76 S.Ct. 497, 500, 53 A.L.R.2d 1008, 1015]. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev. 1961), 317; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' *United States* v. *Grunewald* (2d Cir. 1956) 233 F.2d 556, 581-582 (Frank, J., dissenting), revd. 353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963, 62 AL.R.2d 1344]; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn* v. *United States,* 349 U.S. 155, 162 [99 L.Ed. 964, 972, 75 S.Ct. 668, 673, 51 A.L.R.2d 1157, 1164.]'' (*Murphy* v. *Waterfront Com. of New York Harbor,* 378 U.S. 52, 55 [12 L.Ed.2d 678, 671, 682, 84 S.Ct. 1594, 1596-1597].)

In *Griffin* v. *California, supra,* 380 U.S. 609, 614 [14 L.Ed. 2d 106, 110, 85 S.Ct. 1229, 1232], the California practice of comment on a failure to testify was struck down as a violation of the Fifth Amendment protection against self-incrimination,

the court saying that neither state nor federal courts could permit comment on a defendant's silence or instruct that silence could be an evidence of guilt. The court's analysis of the Fifth Amendment is expressed in language from the early case of *Wilson* v. *United States, supra,* 149 U.S. 60 [37 L.Ed. 650, 13 S.Ct. 765] : " '. . . the act was framed with a due regard also to those who might prefer to rely upon the presumption of innocence which the law gives to every one, and not wish to be witnesses. It is not everyone who can safely venture on the witness stand, though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offenses charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would therefore willingly be placed on the witness stand. The statute, in tenderness to the weakness of those who from the causes mentioned might refuse to ask to be witnesses, particularly when they may have been in some degree compromised by their association with others, declares that the failure of a defendant in a criminal action to request to be a witness shall not create any presumption against him.' 149 U.S., p. 66, 37 L.Ed. pp. 651-652, 13 S.Ct. p. 766.

"If the words 'Fifth Amendment' are substituted for 'act' and for 'statute' the spirit of the Self-Incrimination Clause is reflected." (*Griffin* v. *California,* 380 U.S. 609, 614 [14 L.Ed.2d 106, 109, 85 S.Ct. 1229, 1232].) The court did expressly decline to state whether a defendant in a state court may require an instruction that his failure to testify must be disregarded by the jury, although such is the law in federal courts. See *Bruno* v. *United States,* 308 U.S. 287 [84 L.Ed. 257, 60 S.Ct. 198].

It appears clear to us that the constitutional privilege against self-incrimination must be contemporaneously evaluated as an expression of personal right and freedom which may not be eroded by expediency whatever its guise or motives. As self-preservation is said to be the first law of nature, silence in safety is a paramount right of each individual if he chooses to exercise it. As a paramount right it may not be subordinated to the needs of another absent the volition of the possessor of the right. And if the right be exercised, in the context of a trial, be it by a defendant or a witness, it can be given its full and encompassing effect to the one whose right

it is only if it results in zero legal effect. As the cases cited suggest, no attribute of admission or implication may attach to the exercise of the constitutional right without depreciation of its spirit and purpose and without diminution of the individual's enjoyment of an unblemished protective device generated and strong in our constitutional system.

The fundamental qualities of the privilege against self-incrimination lead to and support the view of *Wilson* v. *United States, supra,* 149 U.S. 60 [37 L.Ed. 650, 13 S.Ct. 765], that we cannot know the reason why the privilege is exercised in any given instance. The outward face of human personality is no clue to the involuted psychology of the individual. Silence of the possible witness as a matter of constitutional right forecloses supposition of the basic facts which must exist as a foundation for inference. And if no facts are available upon which to found an inference, any supposed inference is actually only a matter of conjecture, speculation or imagination. Without foundational facts to which to apply the legal test of reason or justification to the would-be inference, it is an invitation to deception to permit the jury to consider either a choice not to testify or a choice not to answer. Again, the true measure of the matter is that the fact which the defendant would have before the jury, namely, the declination of the witness to testify, is in fact no evidence at all, either of itself or by implication.

These considerations would lead to the conclusion which *Griffin* v. *California, supra,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], did not discuss: namely, that a defendant as a matter of right would be entitled to an instruction that a failure to testify or a claim of privilege must be disregarded for each and any purpose. Such an instruction would represent the only way humanly possible by which to induce a vacuum of meaning to a factual situation impossible in most instances to keep from a jury. In *Griffin, supra,* Mr. Justice Douglas said: "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." (380 U.S. p. 614, 14 L.Ed.2d p. 110, 85 S.Ct. p. 1233.) The logical extension of those words, given the concept of the Fifth Amendment that its exercise shall in no way legally prejudice or pose a choice of lesser legal evil, requires that the court exercise its instructive power to inform the jury that a defendant's silence is without meaning in any evidentiary sense.

This view is supported, of course, by the holding of *People v. Snyder,* 50 Cal.2d 190 [324 P.2d 1], in which evidence was admitted over objection that defendant, as a subpoenaed witness in a trial of other defendants, had exercised the privilege against self-incrimination and the trial court instructed such evidence could be taken into consideration as a possible showing of consciousness of guilt. In holding untenable the contentions of (1) admission by a party in response to an accusatory statement and (2) showing of consciousness of guilt, the court ruled that ''no implication of guilt can be drawn from a defendant's relying on the constitutional guaranties [against compulsory self-incrimination]'' (p. 197) and overruled and disaproved earlier cases and statements contrary thereto.

Given the personal attribution of the Fifth Amendment right in the paramount sense which has been ascribed to it, together with the principle that reliance upon it shall be without evidentiary value, the application to the instant case is readily seen. First, the defendant, as opposed to the witness, has no right which he may assert superior or even equal to that of the witness who exercises the privilege against self-incrimination; the defendant may call the witness; he cannot compromise the witness' testimonial sanctuary to his own uses by using it as a springboard from which to shift the indication of his own guilt. Second, the claim of privilege having no evidentiary value, it could have no relevance to the question of defendant's guilt or innocence. There was nothing for the jury in the testimony given by the witness and the trial court properly withdrew it from the jury and instructed that what had been heard must be disregarded.

The totality of concept pertaining to the privilege against self-incrimination which we have undertaken to express in terms of evidentiary non-value precludes application of *Fross v. Wotton,* 3 Cal.2d 384 [44 P.2d 350], to which defendant has cited us.

Defendant's second contention is stated thusly: ''Appellant was denied the compulsory process of the court to obtain witnesses, in violation of article I, section 13, of the California Constitution, and due process and equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution, in that he was precluded from obtaining the testimony of Alex Bernal by Alex Bernal's claim of the privilege against self-incrimination, whereas the court could have compelled the testimony for the People

through a grant of immunity under the provisions of Penal Code, section 1324.''

The contention suggests a number of interesting considerations but we refrain from ruling as the point is put for the reason the posture of the case at bench does not make it appropriate so to do. We remark that defendant had the right to call the witness and the witness appeared and was sworn. The defendant did not have the right to any particular sort of testimony from the witness in derogation of the witness' rights as we have held above. Further, the People did not grant immunity to any witness, nor did defendant request that the district attorney exercise the procedure of Penal Code, section 1324 for the benefit of the defendant. The record does not disclose a request of the court for a grant of immunity, although such a procedure has no statutory authority. Cf. *Earl* v. *United States,* 361 F.2d 531.) We have not found nor has our attention been called to any ruling that Penal Code, section 1324 as presently constituted may be applied only to potential prosecution witnesses. Defendant fails to support his assertion that he ''was denied the use of the power [to grant immunity] in his behalf.''

Defendant cites *People* v. *Allen,* 32 Cal.App. 110 [162 P. 401]. to the point that the immunity statute is only for the benefit of prosecution witnesses. The case clearly relies upon the wording of the statute as it then read, which no longer appears in Penal Code, section 1324. *In re Petraeus,* 12 Cal.2d 579 [86 P.2d 343], to the extent it might otherwise restrict the application of section 1324, deals in fact only with Penal Code, section 334 (an immunity statute) in relation to a voluntary defense witness who did not assert his privilege against self-incrimination.

We hold that defendant has not established a factual basis upon which we would be entitled to rule upon due process and equal protection constitutional questions incident to the power to grant immunity and state simply that no error has been shown.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied September 29, 1967, and appellant's petition for a hearing by the Supreme Court was denied November 8, 1967.