[No. E010503. Fourth Dist., Div. Two. June 11, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN LAWRENCE APODACA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 and 3.

COUNSEL

Richard A. Lepore, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith Motley and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DABNEY, J.—Defendant Benjamin Lawrence Apodaca was charged by information in count I with possession of methamphetamine for sale (Health & Saf. Code, § 11378); in count II with possession of marijuana for sale (Health & Saf. Code, § 11359); in count III with possession of cocaine for sale (Health & Saf. Code, § 11351); and in count V with a misdemeanor offense of possession of drug paraphernalia Health & Saf. Code, § 11364).[1] He was found guilty after a jury trial on count I of possession of methamphetamine for sale, on count II of a lesser offense of possession of marijuana (a misdemeanor), on count III of a lesser offense of possession of cocaine, and on count V of possession of paraphernalia. Defendant was sentenced to the middle term of two years on count I, a concurrent term of two years on count III (possession of cocaine), and concurrent terms of one hundred eighty days for each of the misdemeanor convictions on counts II and V. At the time of sentencing, defendant also pleaded guilty to an unrelated charge of possession of methamphetamine and received a concurrent sentence of two years.

Defendant now appeals, contending (1) the trial court erred in finding a defense witness had invoked her privilege against self-incrimination, (2) the court erroneously refused to hold a hearing to determine whether the prosecution had improperly persuaded a defense witness not to testify, and (3) the court erred in instructing the jury not to consider why other persons were not being prosecuted.

---

[1] Count IV, giving away a controlled substance (Health & Saf. Code, § 11379), applied only to codefendant Diana Apodaca, defendant's wife.

FACTS

The prosecution's evidence showed:

Defendant and codefendant Diana Dunlap, now Diana Apodaca, were the managers of a motel near the California-Arizona border. Defendant and Dunlap lived at the motel. Defendant also worked for the Southern California Gas Company.

On April 13, 1990, law enforcement officers conducted an undercover narcotics operation at the motel. Tracy Baysinger assisted in the operation.

During late 1988 or early 1989, Baysinger had worked as a maid at the motel. When she worked at the motel, Baysinger had access to the motel storage room. Before April of 1990, Baysinger had been working undercover with Arizona law enforcement officials as a result of a favorable disposition of Arizona criminal charges against her. Although Arizona and California law enforcement authorities have an ongoing drug task force, Baysinger did not make any agreement with the Riverside sheriff's office before she participated in the operation on April 13, 1990.

Baysinger went to the motel on April 13, 1990, with Arizona Sheriff's Deputy Nichols. Nichols told Dunlap that he had marijuana he wanted to trade for "speed" (methamphetamine). Dunlap gave some methamphetamine to Baysinger and Nichols.

On April 23, 1990, Riverside sheriff's officers went to the motel to serve a search warrant. Sergeant Timothy Lavin went into the motel lobby. As Sergeant Lavin approached, Michael Myers, a motel guest,[2] heard Dunlap say "We're being raided." Myers saw Dunlap grab a coin purse and run into the living quarters. Moments later, the toilet flushed. Sergeant Lavin pursued Dunlap and arrested her as she came out of the living quarters.

A search of the motel living quarters turned up an unzipped leather coin purse in the bathroom sink. Suspected cocaine or methamphetamine powder was on the toilet seat. Dunlap's hands were wet. Sergeant Lavin believed she had either flushed drugs down the toilet or washed them down the sink. A police scanner was found in the bedroom. Defendant's leather jacket had a

---

[2]Myers was apparently also an informant for the sheriff's department, posing as a motel guest. He had a prior conviction of possession of methamphetamine for sale.

syringe in the pocket.[3] Sergeant Lavin also found marijuana and a smoking pipe in a nightstand in the bedroom.

The sheriff's deputies also searched the motel's locked storeroom. Officers discovered jars of marijuana, vials of cocaine and methamphetamine, and a purse made of the same flowered fabric as the coin purse recovered from the bathroom sink. The flowered purse contained the tube of a syringe, another syringe, some tin foil or heat-sealed plastic bindles containing drugs, some cigarette filters with coagulated blood on them, the bowl of a spoon (the handle had been broken off) with a white powder residue, a razor blade, and some gram vials (commonly used to contain cocaine or methamphetamine). The search also turned up a syringe inside a purple sock. Elsewhere in the storage room, officers found binoculars, an appliance for heat-sealing plastic bags, and a notebook. Inside the notebook was a page bearing the names "Diana," and "Ben" or "Benny." In the center of the notebook was a page of markings Sergeant Lavin testified appeared to be pay/owe records of drug transactions.

The pay/owe sheet bore notations "S/C" in the top left corner and then the letters "WK." On the left margin was the word "people" and a column of numbers, 1, 2, 3 and 4. To the right of each of the numbers was another number, 200, 210, 230 and 250. After a line, the designation "non-S/C" and a repeated designation of "WK" appeared. A series of numbers, 1, 2, 3, and 4, were then listed along with corresponding numbers, 210, 230, 250 and 270. Sergeant Lavin, qualified as an expert in narcotics detection and pay/owe records, opined that the sheet was a pay/owe record. The sheet at issue here appeared to be divided into two-week periods, which corresponded to typical narcotics operations, in which a dealer will "front" a customer for drugs one week, and receive payment the following week (corresponding to biweekly paychecks or welfare check receipts). Sergeant Lavin believed that the "S/C" designation referred to Southern California Gas employees, "non-S/C" referred to non-Southern California Gas employees, "WK" referred to the "week" in which drugs were either fronted or paid for, the numbers "1, 2, 3, 4" following the "S/C" or "non-S/C" designations referred to individual customers ("people"), and the additional numbers referred to the amounts owed for drugs.

Law enforcement officers also found in the storage room a bank receipt made out to defendant. The receipt was for the amount of $10,115.43, from the Southern California Gas Company.

Defendant arrived at the motel during the search. He was taken into custody and told he was under arrest for possession of drugs for sale. Defendant then stated, "How much amphetamines did they find?"

---

[3] A check from the motel owners, in the name of the motel but made out in blank, was also found in the jacket pocket. Defendant stipulated he owned the leather jacket.

The prosecution also presented the testimony of Anthony Mele, who worked for the owners of the motel. The owners were in the process of selling the motel and had asked Mele to supervise the property while it was being readied for sale. While Mele was at the motel, he observed defendant doing chores around the motel. One day, defendant asked Mele to help him move some furniture in the storage room. Defendant wanted to clean up the storage room himself, first, however, before Mele came in. Defendant unlocked the storage room; Mele believed defendant got the key from Dunlap. The next day, Mele again saw defendant in the storage room. Mele testified that he did not have direct access to the storage room, and that Dunlap had requested that the storage room be kept locked at all times.

Defendant had told Mele, "if you need anything, just ask me." One day, Mele needed some nuts and bolts. He remembered seeing a bucket of nuts and bolts in the storage room. When Mele asked defendant for nuts and bolts, defendant retrieved some from his bedroom, not from the storage room.

On the day the search warrant was executed, the room of a motel maid, Janis Waples, was also searched. Methamphetamine was found in her room at the motel and also on her person. Before the execution of the search warrant, Sergeant Lavin had had the motel under observation for up to 16 hours at a time. He never saw Waples enter the storage room.

Defendant and Dunlap presented evidence in their own behalf:

Both defendant and Dunlap denied any knowledge of drugs found at the motel. Dunlap testified that drug-related items found in the bedroom were probably "lost and found" items left behind by former motel occupants. She denied ever giving any drugs to Baysinger or Officer Nichols.

Dunlap explained that on April 23, 1990, when the police came to the motel to search it, she was helping a guest (Myers) at the front desk of the motel. Myers had just brought her a purse containing a "dope" scale for her to examine. When Dunlap saw the police, she feared she had been "set up"; she ran to the bathroom and flushed the scales down the toilet. Myers was acting as an informant for the police; charges of possession of methamphetamine for sale were pending against Myers at the time of the incidents here.[4]

The defense attempted to show that other people—Waples, for example—had access to the storage room. Anthony Mele had testified that the motel

---

[4]Myers testified he had previously acquired drugs from defendant's wife and he believed she was dealing drugs from her bedroom.

locks had been changed before the events in question. There was some confusion as to how many master keys existed to the storage room after the locks were changed. Dunlap testified that the only key to the storage room was kept at the front desk. Motel employees had access to the key, however. Dunlap's former mother-in-law visited the motel regularly. She testified that Waples had once opened the storage room for her; she did not see any drugs in the storage room. The mother-in-law also testified that the motel keys were kept in an open area of the motel office. The defense pointed out that Waples, who was present during the execution of the search warrant, had methamphetamine in her room.

The defense also attempted to impeach Tracy Baysinger. Baysinger was facing a 25-year-to-life term on charges pending in Arizona when she agreed to assist in the instant case. Baysinger pleaded guilty to three felony counts, agreed to act as an informant, and was released from jail. When Baysinger went to the motel on April 13, 1990, with Arizona Deputy Nichols, she was searched before and after the contact with Dunlap, but she was not strip searched. When Baysinger had worked as a maid at the motel, she had keys to the rooms. Baysinger's set of keys did not open the living quarters, but it did open the storage room.

The defense tried to establish that defendant had no connection to whatever narcotics activity was taking place at the motel. Mele had testified that defendant never offered him drugs and Mele never saw defendant engaged in narcotics activity. When defendant was arrested, there was no contraband on his person or in his vehicle. Sergeant Lavin had no personal knowledge that defendant was selling or had sold drugs. Dunlap, on the other hand, had previously been arrested for possession of methamphetamine. She admitted prior use of methamphetamine but denied using cocaine. The charges based on her prior arrest were still pending at the time of trial herein.

Finally, defendant presented the testimony of a coworker to show that some of the marks on the alleged "pay/owe" sheet could have been related to defendant's job for the gas company. The coworker testified that a marking of "KW" could stand for "kilowatt," although he had never seen notations like those on the sheet (for, e.g., 200 or 250 kilowatts). Defendant's job included making readings from generators operated by the gas company. A reading or consumption of 250 kilowatts, however, was unusually high. The coworker also did not know what a double zero with a line through it would mean. On cross-examination, the coworker stated that if the notebook said "SC," those letters might mean surge charge, but he had no knowledge what the notations "S/C" or "non-S/C" might mean. The gas company did not monitor any generators that were not Southern California Gas generators.

The coworker also admitted that the letters "WK" are a common abbreviation for "week," and observed that "WK" was not "KW" (kilowatt). The numbers "200," "210," "230," and "250," with two small zeroes following the numbers, appeared more like denominations of money than kilowatt readings.

## DISCUSSION

### 1. *Witness's Invocation of Privilege Against Self-incrimination.*

Defendant first contends the trial court erred in ruling that witness Janis Waples, called by the defense, had properly invoked her privilege against self-incrimination and that, consequently, she did not have to testify.

Waples was called as a witness by codefendant Dunlap. Sergeant Lavin had testified for the prosecution and revealed that Waples, who worked as a maid at the motel, was present when the search of the motel was conducted. Methamphetamine was found in Waples's room at the motel. Sergeant Lavin had testified, however, that he never saw Waples enter the storage room. Waples was called as a witness by Dunlap apparently principally to establish that Waples had access to the storage room where the drugs were found.

The court advised Waples that some of the evidence in the case suggested that she was involved in illegal activities,[5] and the court therefore appointed counsel for her.

Out of the presence of the jury, Waples testified that she never saw Dunlap with methamphetamine, and she did not buy methamphetamine from Dunlap or sell methamphetamine to her in the several months she lived and worked at the motel. Waples gave essentially the same testimony with respect to cocaine and marijuana. Waples stated she knew of the existence of the storage room, and that any of the employees could have gone into the storage room. When Waples was asked whether she ever went into the storage room, her appointed counsel interjected, "I'm going to assert The Fifth, Your Honor." Waples testified she did not recall any incident in which someone approached her about purchasing narcotics from Dunlap, or in which she interceded in anyone's attempt to purchase narcotics from Dunlap.

Because Waples invoked her Fifth Amendment rights on the question whether she ever entered the storage room, the trial court ruled she was

---

[5]Outside the presence of the jury, counsel for defendant read into the record an excerpt from a police report indicating that Waples had involved herself as a go-between in a drug transaction between an undercover officer and Dunlap. Although the undercover officer was "wired," Sergeant Lavin (who was observing from a hidden location), could not hear what Waples was saying; his report was based on the undercover officer's representations as to what Waples said.

unable to be cross-examined about material issues in the case. Accordingly, the court proposed to strike her testimony. Defendant's trial counsel concurred in this assessment. The court did not allow her to testify.

■ Defendant argues that the right against self-incrimination is personal and may only be invoked by the holder. Because Waples's attorney, and not Waples personally, asserted the privilege, defendant argues it was not properly invoked.

■ Defendant's reliance on *People* v. *Ford* (1988) 45 Cal.3d 431, 440 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785], as well as *Rogers* v. *United States* (1951) 340 U.S. 367 [95 L.Ed. 344, 71 S.Ct. 438, 19 A.L.R.2d 378] and *People* v. *Chandler* (1971) 17 Cal.App.3d 798 [95 Cal.Rptr. 146] (overruled on another point in *People* v. *Hill* (1992) 3 Cal.4th 959, 992 [839 P.2d 984]) is misplaced. It is true that generally a witness must first be placed under oath, take the stand and actually refuse to answer an incriminatory question. (*People* v. *Ford, supra,* 45 Cal.3d 431, 440.) This is because the assertion of the privilege cannot be made in a vacuum. The privilege applies only to matter which is incriminatory; it is the court's duty to judge whether a particular question put has the tendency to subject the witness to punishment for crime. It cannot do so in advance of an actual question being put. It is the court, not the individual, that must make the determination whether invocation of the privilege is proper. (*Ibid.*)

Here, the witness appeared, was sworn, placed on the stand, and was asked a specific question. The privilege was asserted as to specifically identifiable matter which the trial court correctly assessed as having the potential to incriminate Waples. If she admitted being in the storage room, that admission could place her in a position of knowledge and access with respect to contraband found there.

Defendant's objection that the privilege against self-incrimination is "personal" to the witness does not avail him. It has been held that a litigant, other than the witness, does not have the right to force the witness to claim the privilege (*People* v. *Chandler, supra,* 17 Cal.App.3d 798, 803), to claim the privilege on the witness's behalf (*People* v. *Varnum* (1967) 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772]), or to assume that the witness will claim the privilege (*Rogers* v. *United States, supra,* 340 U.S. 367, 370-371 [95 L.Ed. 344, 348]; *People* v. *Ford, supra,* 45 Cal.3d 431, 439-440). ■ Clearly, in this sense, the privilege is "personal" to the witness. It cannot be claimed for the benefit or on behalf of another. The privilege is solely for the benefit of the witness. (*Rogers* v. *United States, supra,* 340 U.S. 367, 371 [95 L.Ed. 344, 348].)

■ Some cases have gone so far as to state that the privilege is so "personal" that it may only be invoked by the act of the holder himself or herself, and that a lawyer for the privilege holder cannot invoke it on the client's behalf. We decline to accept such a rule. If the lawyer is clearly acting under the authorization of the client, and invokes the client's privilege, there is little point or sense in insisting that the client also personally invoke the privilege. (See *United States* v. *Johnson* (6th Cir. 1985) 752 F.2d 206, 210-211 [attorney's assertion of client's reliance on privilege was authorized by client, in client's presence, and no disagreement was expressed by client, who had had an ongoing attorney-client relationship with the attorney].)

The same holds here. Waples was fully advised of her rights, especially her privilege against self-incrimination, and counsel was appointed for her for the very purpose of protecting that right. She consulted privately with counsel, presumably on that subject. She was present in court, sworn and on the stand when her counsel expressly invoked the privilege on her behalf. Waples made no gesture, remark or other indication of disapproval or disagreement. There can be no doubt that the attorney was authorized to make the statement. It would be a wasteful exercise to insist that Waples repeat the invocation out of her own mouth under these circumstances, simply for the sake of formality.

We conclude, therefore, that the trial court did not err in accepting the invocation of the privilege.

■ Defendant next contends that, because Waples answered some questions (e.g., that Waples did not see Dunlap possess or offer to sell drugs), she thereby waived her right to assert any Fifth Amendment privilege. Defendant's reliance on *McGautha* v. *California* (1971) 402 U.S. 183 [28 L.Ed.2d 711, 91 S.Ct. 1454], and *Brown* v. *United States* (1958) 356 U.S. 148 [2 L.Ed.2d 589, 78 S.Ct. 622 72 A.L.R.2d 818], is misplaced. ■ A *defendant*, who is not a compelled witness, forgoes his absolute right not to testify, and cannot claim the privilege against self-incrimination on cross-examination as to matters voluntarily testified to on direct examination. A nonparty witness, unlike a defendant, may be subpoenaed and compelled to testify. The witness has not voluntarily placed matters in dispute in the same way as a criminal defendant who voluntarily gives up his Fifth Amendment right and decides to testify in his own behalf. (*People* v. *Bernal* (1967) 254 Cal.App.2d 283, 287 [62 Cal.Rptr. 96].) As previously discussed, the question of privilege with respect to a compelled witness does not arise until he or she answers or refuses to answer a specific question. (*Ibid.* [the defendant called his brother as witness; brother initially answered a question, the

implication of which was that the brother, and not the defendant, owned contraband. The brother's attorney intervened and advised the brother not to answer on the ground that it tended to incriminate him. The answer was stricken and the privilege sustained].)

■ The witness, Waples, did not voluntarily choose to testify. She appeared under compulsion of Dunlap's subpoena, and the court ordered Waples to testify in order to determine if she would invoke the privilege. She could not invoke her personal privilege as to matters that did not incriminate her. The answers to nonincriminating questions do not and cannot operate as a waiver of the witness's privilege. When a particular question did have an incriminatory effect, however, Waples did invoke her privilege. The appropriate remedy, the one the court invoked here, was to strike or disallow all the witness's testimony.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Defendant's contentions are without merit. The judgment is affirmed.

Ramirez, P. J., and Hollenhorst, J., concurred.

*See footnote, *ante*, page 1706.