[No. B222978. Second Dist., Div. Two. Apr. 19, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
HECTOR GARCIA et al., Defendants and Appellants.

## COUNSEL

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant Hector Garcia.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant Martin Avila.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Hector Garcia and Martin Avila pleaded guilty to two counts of failing to disclose the origin of a recording (Pen. Code, § 653w, subd. (a))[1] (counts 1, 2) and one count of counterfeiting a registered trademark (§ 350, subd. (a)(1)) (count 3).[2]

The trial court suspended imposition of sentence and placed appellants on three years of formal probation with terms and conditions that included making victim restitution. After a restitution hearing, the trial court ordered appellants to pay, jointly and severally, the sum of $235,072.68 in victim restitution pursuant to section 1202.4, subdivision (f). This sum was comprised of $173,847.60 to be paid to the Motion Picture Association of America (MPAA) and $61,225.08 to be paid to the Recording Industry Association of America (RIAA).

Appellants appeal on the ground that the restitution order imposed by the trial court must be reversed because its terms amount to an abuse of discretion and rest upon a demonstrable error in law. We amend the order of restitution to eliminate the sums awarded for potential sales of the seized recordings in appellants' possession.

### FACTS

We recite the facts, gleaned from the transcript of the preliminary hearing, in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) Officer Danny Arrona of the Los Angeles Police Department spotted Avila and a companion leaving a building with bags that were found to contain a large number of DVD's of recent films. Avila admitted he was going to sell the DVD's. Avila took the officer to an apartment, in which there were other individuals and "hundreds, if not thousands" of DVD's on shelves. Garcia and another individual came out of a bedroom. The apartment was Garcia's residence. Police found two notebooks that they characterized as pay-owe records. The apartment contained equipment for the manufacturing and packaging of DVD's and CD's (compact discs). Investigators found over 10,000 pirated DVD's and 3,935 counterfeit music CD's in the apartment. Many of the DVD's were of films that had not yet been released on DVD format and were still in theaters.

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

[2] Appellants were charged along with codefendants who are not parties to this appeal.

## DISCUSSION

### I. *Proceedings at Restitution Hearing*

Hector Moya, an investigator employed by Investigative Consultants, which represented the RIAA, assisted police with the identification and cataloging of the suspected pirated merchandise. He confiscated 3,935 music CD's and 17 music DVD's. The RIAA provided Moya with a wholesale value of $7.15 for music CD's and $8.84 for music DVD's. Investigative Consultants incurred costs of $927.50 in its investigation of the case.

Moya examined the pay-owe sheets, which Officer Arrona identified as the ones he found in the bedroom, and he observed notations for approximately 4,000 CD's. The RIAA was seeking damages for what was seized and what was listed in the pay-owe sheets. Moya asserted that there would be no duplicate restitution because the pay-owe sheets were not an inventory of what was in stock, but rather what had been sold in the past. Pay-owe sheets normally represent transactions rather than inventory. Moya stated that, with respect to the items seized at the location, the number of items was to be multiplied by the dollar value provided by the recording industry. The dollar value represented a projection of the selling price of the items had they been authentic. When asked by the defense when the loss on the seized items occurred, Moya replied "When they make the copy of the original CD, that's the loss."

Robert Wetter, an investigator for the MPAA, testified that 10,629 movie DVD's were seized in this case. The MPAA assigned them an average wholesale value of $11.10 each. The MPAA incurred investigation costs of $898.50. Wetter had examined the pay-owe sheets and determined that they were typical of those found in manufacturing labs for DVD's and music CD's. He was able to identify at least 46 MPAA titles in the pay-owe sheets, but, due to time constraints, he was able to determine the quantities for only nine of the titles. There were 4,952 exemplars of these nine titles. Wetter stated that the quantity of DVD's seized on site was "displacing sales." When asked at what point the loss was suffered by the MPAA with respect to the DVD's in the apartment, Wetter replied "If I understand the question correctly, at the time of the seizure."

The trial court stated that the issue of restitution in this case was governed by section 1202.4, subdivision (r), and the statute set forth quite specifically the manner in which the court was to calculate restitution in fraudulent DVD and CD cases. The trial court stated its intention to award restitution based on the amounts submitted by the RIAA and the MPAA, which included restitution for both the seized items and the items in the pay-owe sheets. The trial

court invited argument, and Garcia contended that, although section 1202.4, subdivision (r) governed, the trial court's interpretation of the statute was incorrect. He argued that actual economic loss to the victim should be the guide, not potential loss. The victims would get a windfall because they were actually not "out the loss" that they claimed. In addition, the statute was unconstitutional because it constituted a punishment and denied him due process of law. Avila argued that the pay-owe sheets did not necessarily prove that any specific items were sold, and the items listed in them should not be part of the restitution. Avila also contended that the items in the apartment represented only potential economic loss. The prosecutor responded that the Legislature had enacted section 1202.4, subdivision (r) to curtail these very arguments.

The trial court stated that the amounts requested by the victims were reasonable. With respect to the DVD's seized, the trial court awarded restitution jointly and severally to the MPAA in the sum of $173,847.60 based on a value of $11.10 for each of the 10,629 confiscated DVD's. Using the same value, the trial court awarded $54,967.20 for the 4,952 items in the pay-owe sheets. The award included $898.50 in investigative costs.

With respect to the music CD's and DVD's, the trial court awarded the sum of $61,225.08 to be paid jointly and severally to the RIAA. The amount corresponded to the 3,935 CD's seized at $7.58 each and 17 music DVD's seized at $8.84 each, as well as approximately 4,000 CD's in the pay-owe sheets at $7.58 each. The amount also included investigation costs of $927.50.

The total restitution amount was $235,072.68.

## II.  *Relevant Authority*

In May 2009, when the instant offenses were committed, former section 1202.4, subdivision (r) provided that "[i]n addition to any other penalty or fine, the court shall order any person who has been convicted of any violation of Section 653h, 653s, 653u, or 653w[3] to make restitution to any owner or

---

[3] In May 2009, section 653w, subdivision (a) provided in pertinent part: "A person is guilty of failure to disclose the origin of a recording or audiovisual work if, for commercial advantage or private financial gain, he or she knowingly advertises or offers for sale or resale, or sells or resells, or causes the rental, sale or resale, or rents, or manufactures, or possesses for these purposes, any recording or audiovisual work, the cover, box, jacket, or label of which does not clearly and conspicuously disclose the actual true name and address of the manufacturer thereof and the name of the actual author, artist, performer, producer, programmer, or group thereon." Appellants were convicted of violating former section 653w and section 350, subdivision (a), which provides in pertinent part: "Any person who willfully manufactures, intentionally sells, or knowingly possesses for sale any counterfeit mark registered with

lawful producer, or trade association acting on behalf of the owner or lawful producer, of a phonograph record, disc, wire, tape, film, or other device or article from which sounds or visual images are derived that suffered *economic loss* resulting from the violation. For the purpose of calculating restitution, the value of each nonconforming article or device shall be based on the aggregate wholesale value of lawfully manufactured and authorized devices or articles from which sounds or visual images are devised, unless a higher value can be proved in the case of (1) an unreleased audio work, or (2) an audiovisual work that, at the time of unauthorized distribution, has not been made available in copies for sale to the general public in the United States on a digital versatile disc. The order of restitution shall also include reasonable costs incurred as a result of any investigation of the violation undertaken by the owner, lawful producer, or trade association acting on behalf of the owner or lawful producer. 'Aggregate wholesale value' means the average wholesale value of lawfully manufactured and authorized sound or audiovisual recordings. Proof of the specific wholesale value of each nonconforming device or article is not required."[4] (Italics added.)

"Ordinarily, the standard of review of a restitution order is abuse of discretion. [Citation.] However, when the propriety of a restitution order turns on the interpretation of a statute, a question of law is raised, which is subject to de novo review on appeal." (*People v. Williams* (2010) 184 Cal.App.4th 142, 146 [108 Cal.Rptr.3d 772].) "A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall." (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172 [107 Cal.Rptr.3d 895].) The trial court is not required to order restitution equal to the exact amount of the loss, but it must employ a rational method that makes the victim reasonably whole. The restitution order may not be arbitrary or capricious. (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 992 [81 Cal.Rptr.2d 886].) "The only limitation the Legislature placed on victim restitution is that the loss must be an ' " 'economic loss' " ' incurred as a result of the defendant's criminal conduct." (*People v. Williams, supra,* at p. 147.)

III.  *Appellants' Arguments*

According to appellants, the trial court misunderstood section 1202.4, subdivision (r) when it erroneously awarded restitution of the wholesale value of the confiscated items when there was no economic loss associated with

the Secretary of State or registered on the Principal Register of the United States Patent and Trademark Office, shall, upon conviction, be punishable as follows . . . ."

[4] The current statute is largely the same except for the addition of a subdivision and additions to the list of crimes requiring the restitution prescribed, such as section 350, of which appellants were also convicted. (§ 1202.4, subd. (r)(1), (2).)

these items. Thus, the restitution awarded in connection with the confiscated merchandise lacks a rational basis and amounts to a windfall, since it was never sold and did not displace any sales of the same items by the RIAA or the MPAA members.

Appellants also argue that there was no rational basis for the trial court's restitution awards with respect to the pay-owe sheets. Appellants claim that none of the witnesses—neither Moya, Wetter, nor Officer Arrona—were able to testify as to the meaning of the pay-owe sheets. Therefore, there was no justification for the court's conclusion that the pay-owe sheets represented past sales. It was therefore an abuse of discretion for the trial court to so conclude.

## IV. *Restitution May Not Be Awarded for Potential Economic Loss*

Appellants emphasize that section 1202.4, subdivision (r) first provides that economic losses must be suffered, and it then explains how the restitution is to be calculated. Therefore, assigning the aggregate wholesale value as the loss where there is none violates the intent of the victim restitution statute. (§ 1202.4, subd. (f).)

Appellants rely on *People v. Ortiz* (1997) 53 Cal.App.4th 791 [62 Cal.Rptr.2d 66] (*Ortiz*), in which the defendant was convicted of one count of violating section 653w, subdivision (a). The defendant possessed for sale approximately 53,000 counterfeit cassette tapes. (*Ortiz, supra*, at p. 794.) *Ortiz* first held that the Association of Latin American Record Manufacturers (ALARM) could properly claim restitution on behalf of the victims it represented (*id.* at pp. 795–797) and, second, that investigatory costs were payable as part of restitution (*id.* at pp. 797–798). The final issue in *Ortiz*—the one most relevant to the instant case—centered on the 53,000 confiscated cassette tapes, for which ALARM sought restitution of $530,000, or an approximate sale price of $10 each. (*Id.* at p. 798.) When the trial court pointed out that the tapes had been seized and could not be sold, ALARM responded that the figure represented a " 'a potential loss' " because " 'they were going to be sold.' " (*Ibid.*) *Ortiz* held that the trial court properly rejected this potential loss theory of recovery. (*Ibid.*) The *Ortiz* court determined that the trial court devised a rational basis for calculating the actual economic loss by extrapolating from the amount of cash found at defendant's place of business and her customary selling price for the counterfeit tapes. (*Id.* at p. 799.) The *Ortiz* court added that where a statute requires a specific basis for determining the loss, the court must determine the loss on that basis. (*Id.* at p. 800, fn. 6.)

Subdivision (r) was added to section 1202.4 approximately 10 years after the *Ortiz* decision. Paul Krekorian, the California Assembly member who

introduced Assembly Bill No. 2750 (2007–2008 Reg. Sess.) (Assembly Bill No. 2750) containing the revision, explained his intent to the chief clerk of the California State Assembly in a letter dated August 29, 2008, which appeared in the Assembly Journal for the 2007–2008 Regular Session on page 7172. (See Historical and Statutory Notes, 50D West's Ann. Pen. Code (2011 supp.) foll. § 1202.4, p. 41.) Assemblymember Krekorian wrote that his intent was to propose "a clearer standard for restitution and direction to the courts in cases involving the piracy of creative works, including music and movies." He wished to "provide a rational guidance for the amount of restitution that shall be ordered." The end result was not the clarity that he sought.

"We begin with the touchstone of statutory interpretation, namely, the probable intent of the Legislature. To interpret statutory language, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) " ' "If the language [of a statute] is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." [Citation.]' " (*People v. Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].) We do not give statutory language a literal construction if it is contrary to the legislative intent apparent in the statute. (*People v. Robles* (2000) 23 Cal.4th 1106, 1114 [99 Cal.Rptr.2d 120, 5 P.3d 176].) Given the confusion exemplified by the instant case, we are obliged to interpret section 1202.4, subdivision (r) in accordance with the legislative intent expressed during its progress to passage in final form. Since this is a question of law, we may consider the legislative analyses even though they were not available to the trial court. (*People v. Cherry* (1989) 209 Cal.App.3d 1131, 1134 [257 Cal.Rptr. 684].)

The legislative history of Assembly Bill No. 2750 shows that the statute originally called for restitution to be based on the number of nonconforming devices or articles *involved* in the criminal offense. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2750 (2007–2008 Reg. Sess.) as amended Apr. 21, 2008, for hearing June 24, 2008, com. 6, p. P (hereinafter Senate Committee Report).) Comment 6 states that "[i]t appears that the terms of [Assembly Bill No. 2750] could be used to argue that a victim of record or audio-visual piracy is entitled to restitution for potential lost sales, as measured by the number of pirated works seized from the defendant and destroyed. The bill states that the defendant shall pay restitution, based on the average value of legitimate works in the market, for the number of nonconforming devices or articles involved in the offense. The most common offense included in this bill is Penal Code Section 653w—failure to disclose the

origin[5] of a musical or audio-visual work. A defendant violates Section 653w by selling, advertising for sale, manufacturing, renting, or possessing for any of these purposes, pirated musical or audiovisual works. Thus, a defendant is guilty of record piracy for possessing pirated works with the intent to sell them. RIAA or another music or audio-visual piracy victim could argue that this bill authorizes restitution for 'potential loss' of sales as measured by the number of works recovered from the defendant, although the works were not sold, and thus did not replace a legitimate sale. [¶] Industry representatives have argued that a music or audio-visual pirates' unsold inventory of illegally produced or copied works represents a lost wholesale sale. This appears to ignore that a pirate would never obtain pirated works from a legitimate wholesaler. Only legitimate retail sales were preceded by a legitimate wholesale sale. Any illicit work sold at the retail or street level never went through the legitimate wholesale market." (*Id.* at pp. P–Q.)

Respondent cites in support of the trial court's restitution order a victim-impact statement submitted in this case by the RIAA.[6] According to this statement, "the wholesale value of legitimate product should be multiplied by the number of unlawful articles found in the defendant's possession. This is because legitimate retailers must purchase genuine music recordings from authorized wholesale sources in order to offer them for sale. When pirates possess illicit merchandise, their possession constitutes the displacement of what would normally be lawful wholesale purchases. This economic harm at the wholesale level—which occurs irrespective of whether defendant ever succeeds in selling his or her illicit product to a consumer—is the main reason that music piracy costs the United States recording industry more than $5.33 billion per year." The preceding paragraph clearly shows that the RIAA's rationale was rejected during the hearing process on Assembly Bill No. 2750.

The Senate Committee Report also addressed the issue of restitution as punishment in piracy cases, noting that the piracy statutes authorize severe punishment. (Sen. Com. Rep., com. 6, p. Q.) The report noted that a violation of section 653w that involved at least 100 illicit recordings could be a felony entailing a prison term of two, three, or five years. The court could also impose a fine of up to $250,000 (the current statute sets the maximum fine at $500,000). (§ 653w, subd. (b)(1).) Mandatory penalty assessments of approximately 270 percent could be imposed in addition to the base fine.[7] Thus, the

---

[5] "Because a purely copyright based state crime would be preempted by federal law, California piracy is defined as failing to disclose the (illicit) origin of the work."

[6] The MPAA merely provided a list of DVD's seized and requested restitution consistent with the value of the product seized and based on the average wholesale value.

[7] See, e.g., *People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1528–1531 [98 Cal.Rptr.3d 1], for a catalogue of mandatory penalties imposed upon fines in criminal cases.

report concluded, a fine of $250,000 results in a fine of $925,000. The report stated that, "[a]rguably, allowing restitution for potential lost sales, as measured by the number of illicit items the defendant possessed for sale, does not compensate the victim for a true loss. Such payments would appear to be simply punitive. Assuming that restitution, in addition to compensating the victim and rehabilitating the defendant, can serve a partly punitive purpose through ensuring that amends are made to society, the significant prison terms and a fine of up to $925,000 would appear to provide more than adequate punishment." (Sen. Com. Rep., at p. Q.)

The Senate Committee Report suggested amendments to the language of the bill in order to eliminate restitution "corresponding to the number of nonconforming devices or articles *involved* in the violation." (Italics added.) (Sen. Com. Rep., com. 9, pp. S–U; Assem. Bill No. 2750, as amended in Sen. June 30, 2008.) These amendments were apparently intended to preclude the interpretation that a victim of piracy was entitled to compensation for potential lost sales. The suggestions were adopted, and section 1202.4, subdivision (r) does not contain that language. (See § 1202.4, subd. (r).) As we see in the instant case, the desire of the piracy victims to obtain restitution for seized inventory has led them to capitalize on the vacuum left by the Legislature's elimination of the "involved in" language and failure to replace it with a narrower and hence, clearer, definition. Although it may be appealing to impose restitution for seized pirated items as a punishment measure in the way quantity enhancements regulate the degree of punishment in controlled substances cases, this was not the Legislature's intent. (See, e.g., Health & Saf. Code, §§ 11370.4, subds. (a)(1)–(6), (b)(1)–(4), 11379.8, subd. (a)(1)–(4).) The intent of subdivision (r) was to recompense a victim's economic loss rather than to punish offenders commensurate with the size of their inventory. Viewing the changes made to the proposed amendment as a result of the Senate Committee Report, quoted *ante*, we conclude that, as held in *Ortiz*, potential sales cannot be used as a basis for restitution.[8] Hence, in the instant case, appellants cannot be ordered to pay restitution based on their inventory.

Accordingly, the portion of the restitution awarded for the seized merchandise represented potential economic loss and was erroneously included in the restitution order. Although appellants dispute the implication that the pay-owe sheets found in the apartment represented past sales, the trial court heard two experts with substantial experience in the investigation of piracy cases testify

---

[8] The Senate Committee Report also outlined the decision in *Ortiz* and stated that the first two of its holdings would be "placed in statute" by Assembly Bill No. 2750. The report noted that "[t]he appellate court [in *Ortiz*] also held that the trial judge 'properly rejected ALARM's "potential loss" theory of recovery,' " citing *Ortiz, supra*, 53 Cal.App.4th at pages 798–799. (Sen. Com. Rep., com. 3, pp. K–L.)

that the pay-owe sheets represented transactions and were typical of the records found in manufacturing operations of counterfeit DVD's and CD's. Pay-owe records, combined with expert testimony, are frequently admitted as circumstantial evidence of illicit transactions. (See, e.g., *People v. Hoyos* (2007) 41 Cal.4th 872, 884 [63 Cal.Rptr.3d 1, 162 P.3d 528]; *People v. Dimitrov* (1995) 33 Cal.App.4th 18, 25 [39 Cal.Rptr.2d 257]; *People v. Apodaca* (1993) 16 Cal.App.4th 1706, 1710 [21 Cal.Rptr.2d 14]; *People v. Harvey* (1991) 233 Cal.App.3d 1206, 1220–1221 [285 Cal.Rptr. 158].) We find no abuse of discretion in the restitution award based on the information in the pay-owe sheets.

The restitution order must be modified to reflect an award of $54,967.20 to the MPAA for the items listed in the pay-owe sheets in addition to the $898.50 for reimbursement of investigative costs. The RIAA is owed only the sum of $30,320 for the 4,000 items reflected in the pay-owe sheets, which were priced at $7.58 each. The RIAA is entitled to investigative costs of $927.50. The total restitution award is $87,113.20.

## DISPOSITION

The judgments are modified to reduce the amount of restitution to $87,113.20, which reflects the victims' actual economic loss. The restitution is to be paid jointly and severally. In all other respects the judgments are affirmed.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 27, 2011, S192509. Werdegar, J., did not participate therein.