Filed 3/16/23  P. v. Ayala CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO AYALA,<br><br>    Defendant and Appellant. | F083941<br><br>(Super. Ct. No. VCM281353B)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN LUIS AYALA,<br><br>    Defendant and Appellant. | F083974<br><br>(Super. Ct. No. VCM281353A) |

APPEALS from judgments of the Superior Court of Tulare County.  Gary L. Paden, Judge.

G. Bryan Pinion for Defendant and Appellant Alfredo Ayala.

Anthony P. Capozzi and G. Bryan Pinion for Defendant and Appellant Juan Luis Ayala.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Alfredo Ayala and Juan Luis Ayala[1] owned farm labor contracting businesses and shared business offices and office staff. Defendants were charged with insurance and tax fraud by underreporting their payroll amounts. Alfredo and Juan pleaded no contest to workers' compensation insurance fraud and tax fraud, agreed to pay restitution to the Employment Development Department (EDD), and requested a restitution hearing to determine restitution owed to their workers' compensation insurance companies. After a hearing, the trial court awarded restitution to the insurance companies measured by the amount of lost premiums caused by defendants' false payroll reporting.

Defendants argue that the trial court erred in calculating restitution because (1) the prosecutor failed to present evidence that defendants' criminal conduct caused payment of lowered premium amounts to the insurers and, even if the evidence was sufficient, that (2) the trial court should have calculated the premium owed on only the unreported payroll amount and the unreported payroll amount should have been calculated based upon only the voided payroll check amounts reflected in defendants' computers. The People respond that defendants' *Harvey*[2] waivers established they fraudulently underreported their businesses' payroll to the insurers and the trial court properly determined the insurers' economic losses by calculating the premiums that should have been paid to the insurers based upon the corrected payroll amounts. We conclude that the

---

[1] Hereinafter, to avoid confusion given the shared surname, we will refer to Alfredo Ayala and Juan Luis Ayala by their first names. No disrespect is intended.

[2] *People v. Harvey* (1979) 25 Cal.3d 754.

2.

trial court did not abuse its discretion in calculating restitution in this case and affirm the judgments, but we vacate an erroneous fee imposed by the trial court.

## PROCEDURAL BACKGROUND

The Grand Jury of Tulare County returned an indictment, filed on April 5, 2013, charging Juan with workers' compensation fraud (Ins. Code, § 11760, subd. (a); counts 1, 3, 5, 7, 9, 40, 41), insurance fraud (Ins. Code, § 11880, subd. (a); count 11), and tax evasion by false statement (Unemp. Ins. Code, § 2117.5; counts 2, 4, 6, 8, 10, 12, 13, 42, 43). The indictment also charged Alfredo with workers' compensation fraud (Ins. Code, § 11760, subd. (a); counts 14, 16, 18, 20), insurance fraud (Ins. Code, § 11880, subd. (a); count 22), and tax evasion by false statement (Unemp. Ins. Code, § 2117.5; counts 15, 17, 19, 21, 23, 24). The indictment further alleged that the offenses constituted a pattern of related felony conduct that involved taking more than $500,000 (Pen. Code, § 186.11, subd. (a)(2);[3] counts 1–24, 40–43) and resulted in a loss of more than $3.2 million (former § 12022.6, subd. (a)(4); counts 1–24) and more than $1.3 million (former § 12022.6, subd. (a)(3); counts 40–43). Juan and Alfredo entered pleas of not guilty and denied the special allegations.

On September 24, 2013, the trial court granted defendants' motion to dismiss certain counts of the indictment as barred by the applicable statute of limitations (counts 1–4, 6 as to Juan & counts 14[4]–17, 19 as to Alfredo).

During a hearing on January 9, 2018, the trial court placed on the record discussions regarding resolution of the charges involving Juan and Alfredo. Alfredo agreed to plead no contest to one misdemeanor count and Juan would plead no contest to two felony counts, but neither defendant would face jail time. The trial court explained to Juan that it intended to impose a suspended three-year state prison sentence and

---

[3]     Undesignated statutory references are to the Penal Code.

[4]     The trial court's order erroneously refers to counts "1, 4" but should have referred to count "14" as counts 1 and 4 were not alleged against Alfredo.

ordered Juan to serve a three-year term of probation conditioned upon obeying all laws and paying restitution to EDD.  Alfredo would be placed on a three-year term of misdemeanor probation conditioned upon obeying all laws and paying restitution to EDD.

Defendants stipulated to a factual basis for their pleas based on police reports and grand jury proceedings.  Juan pleaded no contest to workers' compensation fraud (Ins. Code, § 11760, subd. (a); count 5) and tax evasion by false statement (Unemp. Ins. Code, § 2117.5; count 8).  Alfredo pleaded no contest to tax evasion by false statement (Unemp. Ins. Code, § 2117.5; count 21).

Alfredo waived time for sentencing, and the trial court reduced count 21 to a misdemeanor and ordered Alfredo to serve a three-year term of probation with conditions that Alfredo obey all laws, pay restitution to EDD,[5] and return for a restitution hearing. The prosecutor moved to dismiss counts 8, 18, 20, 22, 23, and 24 as to Alfredo with *Harvey*[6] waivers to allow the prosecutor to seek restitution as to the dismissed counts, and the defense agreed.  The prosecutor and defense similarly agreed that the remaining charges as to Juan would be dismissed with *Harvey* waivers when Juan was sentenced.

The trial court held a restitution hearing as to both defendants on July 9, 2021, and announced its decision on August 24, 2021.  The trial court denied defendants' subsequently filed motion for reconsideration on December 17, 2021, and sentenced Juan to three years in prison, suspended execution of that sentence, and placed him on probation for two years.  The trial court also ordered Juan to pay restitution as previously

---

[5]    Juan subsequently stipulated to pay EDD restitution in the amount of $3,368,857.37, and Alfredo stipulated to pay EDD $890,144.07.

[6]    "A *Harvey* waiver permits the sentencing court to consider the facts underlying dismissed counts and enhancements when determining the appropriate disposition for the offense or offenses of which the defendant stands convicted."  (*People v. Munoz* (2007) 155 Cal.App.4th 160, 167.)

ordered,[7] a $500 restitution fine (former § 1202.4),[8] a stayed $500 probation revocation restitution fine (§ 1202.44), a $250 presentence investigation report fee (former § 1203.1b),[9] $80 in criminal operations assessments (§ 1465.8), and $60 in criminal conviction assessments (Gov. Code, § 70373).

Defendants filed their timely notices of appeal on February 10, 2022. We ordered the appeals consolidated for all purposes on January 24, 2023.

## FACTS

### I. Calculating workers' compensation insurance premiums.

"Workers' compensation premium is determined in several steps. The employer's operations and employees are classified pursuant to one of nearly 500 classifications codes found in the Uniform Statistical Reporting Plan-1995 … or the insurer's filing. The insurer uses the classification code to determine the rate to use to calculate premium. Many businesses will have more than one classification code used to determine premium. The rate is a dollar amount that applies to each $100 of payroll for each classification applied to the policy resulting in a base premium. The exact amount of premium cannot be determined until after the policy has expired. Insurers use an estimated annual premium to collect premium during the policy and determine the exact premium at the expiration of the policy when the payroll records are available for audit. Insurers may use monthly payroll reports to estimate premium during the policy period.

---

[7] The trial court stayed execution of the restitution orders pending these appeals.

[8] Former section 1202.4 was repealed by its own language and a new section 1202.4 reenacted effective January 1, 2022. The minor changes in language do not affect the outcome of these appeals. (See Stats. 2021, ch. 257, § 19 [repealed]; Stats. 2021, ch. 257, § 20 [reenacted].)

[9] The trial court referred Juan's matter to the probation office for preparation of an abbreviated report on January 9, 2018, and scheduled Juan's sentencing hearing for May 7, 2018. The matter was continued several times before Juan was sentenced on December 17, 2021. Before sentencing, however, Assembly Bill No. 1869 (2019–2020 Reg. Sess.) effective September 18, 2020, and operative July 1, 2021, added former section 1465.9, which stated: "On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section … 1203.1b … as [that] section[ ] read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Former § 1465.9, subd. (a), added by Stats. 2020, ch. 92, § 62, p. 2195.) We, therefore, vacate this fee as former section 1203.1b was no longer in effect at the time Juan was sentenced.

"Insurers must modify the base premium by an experience modification if an employer is eligible for experience rating under the regulations of the California Experience Rating Plan .…  The [Workers' Compensation Insurance Rating Bureau] issues an experience rating form containing the experience modification for each eligible employer.  The experience modification is calculated in accordance with the [California Experience Rating Plan].  After the base premium is modified by the required experience modification, it may be further modified by application of surcharges, deductible credits, retrospective rating adjustments, policy holder dividends, reinsurance assumed and adjustments for reinsurance ceded.  Each insurer files the terms of its underwriting plans with the California Department of Insurance along with the rates by classification code.  Workers' compensation rate filings are file and use with a 30-day waiting period after the filing is complete."  (1 Herlick, Cal. Workers' Compensation Law Handbook (42d ed. 2023) Insurance and Self-Insurance, § 3.2, p. 3-5.)

"The nature of the employee's operation, and the extent of the payroll for the various occupations and operations in which the employer engages are of vital importance in setting the premium.  The employer is therefore obliged to keep careful payroll records and classification of employees and to make these available to the insurance carrier upon reasonable request."  (2 Pollak et al., Cal. Workers' Compensation Law & Practice (2022) Insurance Premiums, § 13:265, p. 13-68.)

## II.     Grand jury testimony.[10]

J.A. Contracting, Inc. (JA Contracting) and J.A. Contracting Labor Management, Inc. (JA Labor), owned by Juan, and Ayalaz Ag Services (Ayalaz Ag),[11] owned by Alfredo, were farm labor contracting businesses that provided agricultural workers to local growers to assist with the harvesting of commercial crops.  The businesses were required to purchase workers' compensation insurance.  (See Lab. Code, § 3700.)

### A.     Premium Fraud

Typical workers' compensation insurance policies are based on estimates.  The insured provides monthly payroll reports during the policy period.  At the end of the

---

**10**     We have set forth evidence presented to the grand jury that relates to the counts not dismissed by the trial court.

**11**     Ayalaz Ag Services was previously named Ayala Ag Services.

policy period, the insurer performs an audit to determine the correct payroll numbers, employee classification codes, and verify the operations of the business. Premium audits entail reviewing a business's payroll records, payroll tax filings, incomes statements, and sales reports. The audit occurs after the expiration of the policy, generally within 60 to 90 days.

Isidro Covian worked for JA Contracting between September 2008 and April 2011. Covian testified before the grand jury that he was responsible for preparing the payroll calculations that were reported to the insurers providing workers' compensation insurance to JA Contracting, JA Management, Ayalaz Ag and three other companies. Javier Diaz, Covian's manager, printed out the monthly payroll report for each business and instructed Covian to calculate a percentage of the total that was then reported to the insurer, usually between 10 and 20 percent.[12] In addition, the monthly payroll was categorized by job classification, and Diaz instructed Covian as to the percentage of each job classification to report. Covian was asked to make these calculations for each business and for every month that he worked at JA Contracting. As a result, the total amount of payroll and the individual employee classifications of payroll were incorrectly reported to the insurers.

The Tulare County District Attorney's Office initiated the investigation in this case in July 2011. Rowlett executed a search warrant at two business addresses shared by JA Contracting, JA Labor, and Ayalaz Ag in September 2011.[13] Rowlett seized payroll documentation, insurance files, tax documents, billing invoices, accounts receivables, personnel files, and computer equipment used in conducting the businesses.

---

[12] Diaz told Josh Rowlett, an investigator for the district attorney, that Juan made all decisions regarding payroll reporting and workers' compensation insurance payments.

[13] The investigation encompassed three other businesses not owned by defendants but operated out of the same office with the assistance of Juan's office employees.

For each insurer, Rowlett seized the monthly payroll reports that the businesses provided to the workers' compensation insurance companies, payroll journals printed from the businesses' computer that corresponded to the monthly reports, and a computer printout of a voided check journal for that month, organized by relevant policy periods as follows:[14] (1) JA Contracting records relating to Liberty Mutual Insurance Company (Liberty) for policy period June 2008–June 2009; (2) JA Contracting records relating to SeaBright Insurance Company (SeaBright) for policy periods June 2009–June 2010 and June 2010–April 2011; (3) JA Contracting records relating to State Compensation Insurance Fund (SCIF) for June 2011–August 2011; (4) JA Labor records relating to Union Labor Life Insurance (Ullico) for policy periods February 2010–February 2011 and February 2011–February 2012;[15] (5) Ayalaz Ag records relating to Liberty for policy period August 2008–August 2009; (6) Ayalaz Ag records relating to Meadowbrook Insurance Group (Meadowbrook) for policy period August 2009–August 2010;[16] and (7) Ayalaz Ag records relating to SCIF for policy period August 2010–August 2011.

## B. Experience Modification Factor

The premium of a workers' compensation insurance policy is determined, in part, by an experience modification assigned to an employer by the Workers' Compensation Insurance Rating Bureau. The experience modification is determined by comparing a specific employer's payroll and losses to other similar employers. The experience

---

[14] In some cases, Rowlett obtained monthly reports submitted to the insurance companies directly from the insurance company and described the business practices of the insurance company. The records described above were introduced as evidence in the grand jury proceedings.

[15] Rowlett obtained monthly payroll reports for policy period February 2010–February 2011 that JA Labor submitted to Ullico directly from Ullico. JA Labor submitted the monthly payroll reports to Ullico to process the policy premium. Records for policy period February 2011–February 2012 included a single invoice from Ullico and did not include any monthly reports to Ullico.

[16] Rowlett obtained the monthly payroll reports that Ayalaz Ag submitted to Meadowbrook directly from Meadowbrook.

modification can lower the premium if the employer has good safety practices but can result in a higher premium if the employer has a negative history of accidents. For example, a new business has no history of workers' compensation claims and would have a lower experience modification while a business with a higher number of workers' compensation claims would have a higher experience modification and, therefore, a higher premium.

JA Contracting obtained a workers' compensation insurance policy from SCIF that commenced in July 2011.[17] Nafzgar was an underwriter employed by SCIF responsible for working with insurance brokers to analyze the risk associated with an insurance application. As part of that review, Nafzgar was responsible for investigating the ownership of a business, its overall operations, number of employees, and payroll. After SCIF issued the policy to JA Contracting, Nafzgar became aware of Juan's similarly named business, JA Labor, and investigated the relationship of the two companies because, if the entities shared more than a 51 percent common ownership, SCIF would treat the two companies as combinable or insist on covering both companies.[18] Nafzgar was told that Juan owned only 25 percent of JA Labor and, therefore, was not combinable with JA Contracting. As a result, SCIF assigned less risk to issuing the policy.[19]

In 2011, Ullico issued a workers' compensation insurance policy to JA Labor. Greta Cook, a team leader involved with underwriting for Patriot National Insurance

---

[17]    Wendy Nafzgar's testimony and the prosecutor's questions repeatedly confused the names of JA Contracting and JA Labor. However, Toni Ginsburg, an auditor with SCIF, testified that SCIF insured JA Contracting.

[18]    Natzgar explained that as a nonprofit organization, SCIF worked to ensure that brokers were not insuring the "bad portion" of a business with SCIF and insuring the "good portion" of the business with another insurance company.

[19]    Another workers' compensation insurance carrier, Atlas General Insurance Services, rejected JA Labor's earlier application for insurance because it determined that JA Contracting and JA Labor were likely commonly owned and that the latter business had been started in order to take advantage of a lower experience modification afforded due to a lack of history and, as a result, a lower workers' compensation insurance premium.

Group (a partner carrier with Ullico), commenced an investigation that ultimately resulted in canceling the policy due to a material misrepresentation made in the application process. JA Contracting and JA Labor were both owned by Juan, and this had not been disclosed.

### C. Premium Fraud Audits[20]

The insurance companies involved in this case obtained records that the district attorney's office had seized from defendants' businesses and used them to conduct fraud audits. Representatives of these companies reviewed defendants' records and determined that the monthly payroll reports submitted to the companies did not report the businesses' total monthly payroll.[21] Some of the auditors, consistent with Investigator Rowlett's grand jury testimony (see *ante*, part II.A.), testified that the seized records contained the monthly payroll reports submitted to their companies as well as monthly reports for the same periods that showed higher payroll numbers than those reported.

Using these records, the auditors calculated the actual payroll of defendants' businesses and the premiums owed to the insurers based upon the revised payroll amounts, less any previously paid premiums. The auditors testified that the disparity between payroll amounts reported to their companies and the actual payroll was so great that the businesses must have been underreporting payroll amounts to lower their premiums.

---

[20] Representatives of the various insurance companies testified before the grand jury as to the difference in payroll amounts reported to them monthly during the relevant policy periods and the audited payroll amounts determined after reviewing the businesses' records seized by the district attorney's office. Each representative calculated the insurance premium owed based on the revision of payroll as determined by the fraud audits. We shall generally summarize the grand jury testimony here as many of the same witnesses testified during the restitution hearing.

[21] Dennis Hill, Ullico's representative, testified that JA Labor paid monthly premiums for policy period February 2011–February 2012 based upon an estimate of payroll provided by JA Labor at the beginning of the policy period.

### D. Payroll Underreporting to EDD

Clara Ramirez worked as an auditor and investigator for EDD and audited defendants' businesses. Ramirez reviewed the records seized by the district attorney's office, which included bank statements, general ledgers, payroll information, and voided check registers. Ramirez testified that JA Contracting underreported its monthly payroll amounts to EDD and calculated the actual payroll to be (1) $35,737,494.36 in 2008 (only $11,528,586 was reported); (2) $44,005,394.48 in 2009 (only $14,675,894 was reported); (3) $40,228,719.22 in 2010 (only $15,122,326 was reported); and (4) $8,413,935.70 in 2011 (only $3,792,616 was reported).

Ramirez testified that JA Labor underreported its monthly payroll amounts to EDD and calculated the actual payroll to be (1) $2,960,544.84 in 2010 (only $582,644.91 was reported) and (2) $15,232,925.23 in 2011 (only $3,259,436.91was reported).

Ramirez testified that Ayalaz Ag underreported its monthly payroll amounts to EDD and calculated the actual payroll to be (1) $7,076,135.19 in 2008 (only $864,593 was reported); (2) $6,265,783.93 in 2009 (only $894,213 was reported); (3) $7,614,978.64 in 2010 (only $1,052,569.30 was reported); and (4) $3,193,123.61 in 2011 (only $639,647.83 was reported).

Ramirez testified that the payroll amounts reported to EDD were found in the records of the businesses but that the payroll records were artificially lowered by categorizing a significant number of payroll checks as voided within the businesses' computer database. She compared a sampling of the voided check register to bank statements and determined that the voided checks had, in fact, been processed by the bank. For the sampling, Ramirez examined voided checks from one payroll period for each business and used different periods.

### III. July 9, 2021 restitution hearing.

#### A. People's Evidence

##### 1. *Neil Johnson–Liberty*

Neil Johnson was the vice president and manager of Liberty's premium fraud special investigations unit. Liberty sent field auditors to JA Contracting and Ayalaz Ag after every policy year to audit them for the insurance premium paid that policy period. The auditors reviewed the summary monthly payroll reports provided by the companies (later determined to have been false) and compared the figures to the quarterly tax returns. The auditors did not compare the payroll amounts with the checks issued to the workers.

In 2011, Johnson conducted a premium fraud audit. Johnson explained his methodology for determining the workers' compensation insurance premiums owed to Liberty. He first calculated the difference between the payroll as reflected on the original monthly payroll reports provided to Liberty's auditor and the true monthly payroll reports seized from the businesses.[22] The difference corresponded to the payroll checks that had been voided in the businesses' computer but were actually cashed by the employees.

Johnson explained that it appeared that the businesses issued payroll checks to employees who cashed the checks. The businesses then voided the checks in their computer system and provided the printed payroll reports to the auditors who saw lower payroll amounts that had been reduced by the amounts of the payroll checks re-characterized as having been voided. Normally, if a payroll check was voided to due to an error in the check, it would be reissued and the voided and re-issued check would balance out in the payroll. However, defendants' businesses removed cashed checks

---

[22] Both the monthly payroll reports provided to Liberty's field auditors and the true monthly payroll reports seized by search warrant (described by Johnson as "just in the same format as was provided to our field auditors, same exact everything, except different numbers") showed the payroll broken down by classification codes for the employees.

from their computer system, which lowered the payroll amounts in the computer and, therefore, the amounts in payroll reports printed for Liberty.

Johnson then reviewed the businesses' sales journal analysis, which reflected monthly revenues for each business and the payrolls relating to the revenue.[23] Johnson compared the total payrolls in the prepared summaries with the total payrolls reflected in the sales invoices and determined the payroll figures in the monthly summary "were fairly close, off a few million bucks." He later clarified that he identified an additional $3 million of payroll through analysis. Johnson then compared the sales revenue reflected in the general ledger with the sales revenue reflected in the sales journal and determined "they were close." In so doing, he concluded that he "had the true and correct payroll."

In revising the premium, Johnson used the same classification codes and rates applied to the payroll categories reflected in the businesses' original monthly payroll summaries. Johnson did not know what category the additional $3 million of payroll he identified during his sales analysis belonged to, so he applied the rate of the classification codes in the same ratio reflected on the monthly payroll summaries to this amount.

Johnson identified premium and payroll analysis summaries that he prepared (exhibit 1, previously submitted to the grand jury as exhibit 70) for JA Contracting and Ayalaz Ag, organized by three policy periods, which showed the original premium amounts, the revised premiums, the original reported payroll, the revised payrolls, and the differences. For policy period June 2008–June 2009,[24] JA Contracting reported $6,223,113 in payroll, but Johnson's audit revealed the actual payroll was $40,879,473, a

---

**23**    According to Johnson's grand jury testimony, the monthly reports seized from the businesses showed much higher payrolls and he used these figures to determine the actual payrolls where available. However, the documents were incomplete and did not include reports for every month of the policy periods. Johnson reviewed sales invoices to calculate labor costs and determine payroll amounts for the missing months.

**24**    Count 5 charged Juan with fraud in relation to his business, JA Contracting, and his workers' compensation insurance policy for June 2008–June 2009 with Liberty.

difference of $34,656,360. Liberty originally billed JA Contracting $405,810 based upon the initially reported payroll, but the audited payroll figures provided for a premium of $2,617,143, a difference of $2,211,333. For policy period August 2008–August 2009,[25] Ayalaz Ag reported $1,140,349 in payroll, but Johnson's audit revealed the true payroll was $6,504,432, a difference of $5,364,083. Liberty originally billed Ayalaz Ag $62,830 based upon the initially reported payroll, but the audited payroll figures proved for a premium of $433,381, a difference of $370,551.

### 2.    *Frank Robinson–SeaBright*

Frank Robinson,[26] was involved in the premium fraud investigation involving JA Contracting. Robinson's audit involved policy periods June 2009–June 2010 and June 2010–April 2011.[27] Robinson testified that he relied upon documents seized by the district attorney's office from JA Contracting during the audit. Robinson arrived at the audited payroll amounts by adding the total payroll amounts from the records to the total amounts of voided checks found in the businesses' software system. He reviewed the payroll for a sampling of employees to see what was earned and what had been voided. Sometimes, an employee's entire payroll had been reduced to zero. Robinson also reviewed the sales journals and reports, which showed contract labor and labor commissions by month, payroll, and sales.

Robinson testified that exhibit 2 was the direct bill prepared as the result of his audit and showed the revised premium for policy period June 2009–June 2010 (previously marked grand jury exhibit 66). The direct bill reflected the original

---

[25]    Count 18 charged Alfredo with fraud in relation to his business, Ayalaz Ag, and his workers' compensation insurance policy for June 2008–June 2009 with Liberty.

[26]    According to grand jury testimony, Robinson was an assistant vice president of premium audits for SeaBright.

[27]    Count 7 charged Juan with fraud in relation to his business, JA Contracting, and his workers' compensation insurance policy for June 2009–June 2010 with SeaBright. Count 9 charged Juan with fraud in relation to JA Contracting and the SeaBright workers' compensation insurance policy for June 2010–April 2011.

14.

$470,776.32 premium that was based on payroll amounts supplied by JA Contracting. The audited premium amount was $6,527,836. After deducting for previous premium payments, $6,057,059.68 was still owed to SeaBright.[28]

Robinson testified that exhibit 3 was the direct bill prepared as the result of his audit and showed the revised premium for policy period June 2010–April 2011 (previously marked grand jury exhibit 67). The direct bill reflected the original $582,077.34 premium (calculated from payroll amounts originally report by JA Contracting). The actual premium should have been $7,716,794. After deducting the previously paid premium, $7,131,524.04 was still owed to SeaBright.

Robinson also prepared premium summaries attached to the direct bills for each audit that showed the amounts used to calculate the revised premiums (marked by the trial court as exhibits 2A & 3A). According to exhibit 2A, Robinson used a revised payroll amount of $51,335,667 for policy period June 2009–June 2010 and applied a rate of 12.66 percent (based on the payroll classification code) to determine the premium still owed. According to exhibit 3A, Robinson used a revised payroll amount of $33,649,967 for policy period June 2010–June 2011 and applied a rate of 13.05 percent (based upon the payroll classification code) to determine the premium still owed.[29] Although labeled

---

[28]   Robinson testified to the grand jury that he also calculated JA Contracting's actual payroll by adding back voided payroll checks to the payroll amounts found in the general ledger and determined that for policy period June 2009–2010 the total actual payroll was $44,333,338. He determined that the premium should have been $5,176,092 if based on this amount, leaving a balance of $4,705,316 owed to SeaBright after subtracting the previously paid premium.

[29]   Robinson testified to the grand jury that he also calculated JA Contracting's actual payroll by adding back voided payroll checks to the payroll amounts found in the general ledger and determined that for the 2010–2011 policy period, the total amount of payroll was $27,669,165. However, JA Contracting had only reported total payroll as 3,255,541 for that period. Robinson determined that the premium should have been $5,832,909 based on the corrected payroll amount. Robinson did not testify as to the amount JA Contracting had previously paid for the policy period.

"Payroll" on his summaries, he obtained the amounts from using JA Contracting's sales amounts rather than the actual payroll figures.[30]

Robinson chose to calculate the premium using the rate assigned to the highest employee classification code because defendants' records did not indicate the particular classification codes assigned to the payroll. The Workers' Compensation Insurance Rating Bureau allows an insurer to assign wages to the highest rated classification code when it cannot determine the type of work performed by the employees.

### 3. *Dennis Hill–Ullico*

Dennis Hill was employed by Ullico. Hill personally conducted a premium fraud audit for JA Labor owned by Juan.[31] He compared the original documents that the business submitted to Ullico with the documents seized by the district attorney's office. In conducting the audit, Hill recalled reviewing source documents and the actual payroll numbers reported to the EDD.[32] He did not recall reviewing any voided payroll checks.[33]

Hill testified that he used the JA Labor's monthly reports to EDD to obtain the actual monthly payroll and multiplied that number by the rate determined when Juan originally purchased the policy. The payroll figures submitted to the state were higher

---

[30] In the grand jury proceedings, Robinson testified to the total payroll figures obtained by combining the amounts of voided payroll checks and non-voided checks. Robinson saw payments to employees not recorded as payroll and believed that the payroll figures could not be trusted, so he used sales amounts to calculate insurance premiums as reflected in grand jury exhibits 66 (exhibits 2 & 2A) and 67 (exhibits 3 & 3A).

[31] Count 40 charged Juan with fraud in relation to his business, JA Labor, and his workers' compensation insurance policy for February 2010–February 2011 with Ullico Insurance. Count 41 relates to policy period February 2011–February 2012.

[32] As Ramirez testified that JA Contracting significantly underreported payroll to EDD (see *ante*, part II.D.) and defendants both pleaded no contest to that charge, Ullico's reliance on these figures would also have resulted in a premium lower than what it should have been.

[33] Hill appeared before the grand jury and testified that he reviewed documents seized by the district attorney's office that included payroll summaries, payroll journals, and a voided check register.

16.

than those provided to Ullico. Hill used the same employee classification codes that JA Labor used when it originally reported the payroll figures to Ullico and applied that rate to the total payroll as reported to EDD. As a result of the audit, Hill determined that JA Labor underreported its payroll to Ullico by millions of dollars.

Hill testified that exhibit 6 (previously marked as grand jury exhibit 82) was the premium invoices he prepared as a result of the premium fraud audit he conducted in 2011. The invoices showed the difference between the payroll amounts originally reported to Ullico and the audited payroll amounts for each month of the November 2010–September 2011 policy period. Hill testified that the total amount of premium owed to Ullico as a result of the audit was $2,013,695.[34]

Hill admitted on cross-examination that he did not recall specifically how he determined JA Labor's actual payroll.

### 4. *Luther Jao–SCIF*

Luther Jao was employed by SCIF, a workers' compensation insurance carrier of last resort. His duties included collecting monies owed to SCIF from employers who have been referred to an outside collection agency and, therefore, Jao was familiar with the amounts of premiums owed by defendants.

Jao testified that exhibit 4 was a display bill showing that JA Contracting owed SCIF $830,354.27 for policy period June 2011–September 2011. To determine that amount, SCIF calculated a base premium by applying specified contractual rates to the payroll based upon the employees' classification codes and divided the base rate by 100. After calculating the base premium for each classification, a rating modifier (provided

---

[34]    During his grand jury testimony, Hill testified that JA Labor reported only $366,696 in payroll for policy period February 2010–February 2011 and paid an original premium of $26,257.73. Hill's audit revealed an actual payroll of $2,907,406, resulting in a premium of $294,773 of which $271,544 was outstanding. For policy period February 2011–February 2012, the business reported an estimated payroll of $300,000 to Ullico and made monthly installments totaling $21,477. Hill's audit revealed the actual payroll was $17,395,219, resulting in a premium of $1,763,628 of which $1,742,151 was still outstanding.

during the policy quote) and a premium discount modifier (based on the total base premium) was applied. The final premium was $909,225.61. The balance of premium owed after crediting the $129,167.88 previously received was $780,057.73, to which was added the mandated state surcharges, for a total of $830,354.27.

Jao explained that that the classification codes applied to the payroll are obtained from an employer's ledger account and employee job descriptions. The bill indicated several different classification codes assigned to different portions of the payroll.

Jao testified that exhibit 5 (previously marked as grand jury exhibit 94) was a display bill showing that Ayalaz Ag still owed SCIF $1,685,925.37 (after crediting $109,825.96) for policy period August 2010–August 2011. Six different classification codes were applied to the payroll in determining the premium owed.

### 5. *Lisa Kincaid–Meadowbrook*[35]

In 2011, Lisa Kincaid conducted a premium fraud audit for Meadowbrook Insurance Group on Ayalaz Ag for policy period August 2009–August 2010. Kincaid recreated the original audit[36] by reviewing documents provided by the district attorney's investigator that had been seized from the business. The documents she reviewed included accounting records associated with payroll systems and the general ledger.

To determine Ayalaz Ag's true payroll, Kincaid reviewed the general ledger to ascertain "exactly how much payroll should have been reported or was missing from the original billing." She noted a significant variance in the amount of payroll originally reported to Meadowbrook and ascertained the amount of payroll that should have been reported by using the general ledger. The general ledger contained all categories of income and expenses and should have balanced. Kincaid concluded that the difference between the debits and credits in the general ledger was attributable to voided payroll

---

[35] Meadowbrook is currently named AmeriTrust Group.

[36] Kincaid appears to be referring to the original year-end audit because Kincaid testified as the premium fraud auditor before the grand jury.

checks, that is, the general ledger showed employees were paid more than the payroll register showed they were owed.[37] Ayalaz Ag reported to Meadowbrook only the payroll amount remaining after the payroll checks were voided from the payroll register.[38]

The amounts in the general ledger did not indicate the classification codes assigned to payroll, so Kincaid assigned codes to the payroll resulting from her audit using the same proportion that Ayalaz Ag had originally assigned. The premium was determined by applying the rate factors included in the policy to the payroll, the experience modification assigned to the business by the Workers' Compensation Insurance Rating Bureau, and other modifiers included in the policy.

Kincaid testified that she prepared the final audit invoice for Ayalaz Ag and policy period August 2009–August 2010 (exhibit 7, previously marked as grand jury exhibit 81), which reflected the premium owed to Meadowbrook as the result of her audit. Kincaid determined that the total payroll for Ayalaz Ag for the policy period was actually $6,425,579, which resulted in a total premium of $419,087 of which $384,380 had not been paid.

Upon questioning by defense counsel, Kincaid estimated that a farm labor contracting business might normally void 2 percent or less of its payroll checks.

---

[37] Kincaid explained that because the voided checks had actually cleared the bank, the general ledger did not balance. If the voided checks had not cleared the bank, the general ledger would have balanced because these amounts would not have been recorded as wages.

[38] Kincaid testified that she determined the amount of actual payroll as the amount of variance in the general ledger between the debits and credits relating to payroll. While she reviewed the voided check register, she did not use the amounts to determine the actual payroll. While recognizing that a business would likely have voided payroll checks due to some error, the general ledger would not reflect both the voided check and reissued check to the same employee, but only the check that cleared the bank. As we understand the testimony, because Kincaid did not combine the payroll amount in the general ledger with the amount of voided payroll checks, her figures did not need to be reduced to account for any "legitimately voided" payroll checks because those amounts were already balanced in the general ledger. Defendants submitted a supplemental exhibit which confirms Kincaid only used calculations from the general ledger and not the voided check register.

19.

## B. Defense Evidence

### 1. *Daniel Harold–IT Technician*

Daniel Harold was an IT technician who worked for JA Contracting. He was responsible for ensuring the operation of the computer system and backing up the data. He assisted the district attorney's office to execute its search warrant and access the computers used by defendants' businesses and the other businesses under investigation. The computers were returned by the district attorney's office and continued to be used by defendants' businesses moving forward, although Harold was not aware of whether information the computers contained had been modified. When defendants' businesses ceased operations, in 2012 or 2013, Harold took possession of the physical server and created disk images of the information. The information had not been modified since that time.

At defense counsel's request, Harold produced several reports from the businesses' computers that included total wages, regular wages, and the voided check report for specific policy periods. Harold was asked to assume that 5 percent of the voided checks were legitimately voided, but he believed that 5–8 percent of the checks were legitimately voided based upon his observations of the number of employees who arrived at JA Contracting's lobby on Saturdays to request corrected payroll checks. Harold never ran "these kind[s] of reports" during his employment at JA Contracting.

Harold's reports (exhibits A–J) calculated unpaid premiums by using regular wages and voided check reports, subtracting 5 percent from the voided checks to account for "legitimate" voided checks, and then multiplying the adjusted voided payroll checks amount by 6 percent for the relevant policy periods as follows: (1) For policy period June 2008–2009, JA Contracting had regular wages of $18,368,330.73 and voided checks in the adjusted amount of $17,987,515.56, resulting in an unpaid premium of $1,079,250.93; (2) For policy period June 2009–June 2010, JA Contracting had regular wages of $15,001,393.37 and voided payroll checks in the adjusted amount of

$20,820,584.38, resulting in an unpaid premium of $1,249,235.06; (3) For policy period June 2010–April 2011, JA Contracting had regular wages of $20,716,715.83 and voided payroll checks in the adjusted amount of $5,207,928.06, resulting in an unpaid premium of $312,475.68; (4) For policy period June 2011–September 2011, JA Contracting had regular wages of $6,216,178.86 and voided payroll checks in the adjusted amount of $1,170,904.60, resulting in an unpaid premium of $70,254.28; (5) For policy period August 2008–August 2009, Ayalaz Ag had regular wages of $950,272.87 and voided payroll checks in the adjusted amount of $4,752,490.86, resulting in an unpaid premium of $285,149.45; (6) For policy period August 2010–August 2011, Ayalaz Ag had regular wages of $6,212,980.85 and voided payroll checks in the adjusted amount of $2,080,398.65, resulting in an unpaid premium of $124,823.92; (7) For policy period February 2010–February 2011, JA Labor had regular wages of $23,219,397.77 and voided payroll checks in the adjusted amount of $9,766,179.96, resulting in an unpaid premium of $585,970.90; and (8) For policy period February 2011–February 2012, JA Labor had regular wages of $28,182,418.78 and voided payroll checks in the adjusted amount of $1,060,021.03, resulting in an unpaid premium of $63,601.26.

### 2. Juan

Juan testified that he owned JA Contracting and all stock in JA Labor. Regarding JA Labor's workers' compensation policies with Ullico, Juan testified that he paid monthly premium amounts of $1,600 but, Ullico did not perform a year-end audit. After the district attorney's office issued search warrants for his businesses, Juan's insurance broker notified him that Ullico had canceled their policy. The insurance broker later provided Juan a bill from Ullico and told him that if he paid an $8,000 premium, Ullico would close its books. He paid the bill.

Juan testified that as far he was aware, his businesses cooperated with SeaBright's year-end audits. Juan acknowledged, however, that he was not present for the audits. Juan testified that SeaBright completed an audit in 2010 but not for the policy year

ending in 2011 because the records had been seized. Juan testified that the sales amounts relied upon by SeaBright included commissions he charged for his labor contracting services and that jobs were not invoiced based the cost of labor but were billed based on the type of work performed. Juan also testified that he paid a down payment of $150,000 for his policy with SCIF and $700,000 a month thereafter.

### 3. Trial Court's Restitution Order as to Codefendant

Defendants introduced evidence of a transcript from the restitution hearing held by the trial court for a codefendant. Michael Der Manouel, founder and president of a company selling workers' compensation insurance, testified that the premium rate for policies involving farm labor contractors working in the vineyard classification was 4 to 6 percent. In ordering restitution as to the codefendant, the trial court adopted 6 percent as the classification rate to be applied to the corrected payroll amounts when calculating the premiums that the insurance companies should have been paid.

### 4. Posthearing Evidence

Defense counsel filed a restitution hearing summation that included an unsigned declaration from Juan that JA Contracting paid SCIF $461,607.30 between June 10, 2011 and November 21, 2011. The declaration included copies of the checks written to SCIF, three of which also showed the check backs indicating SCIF had deposited them. The summation also included a declaration from Harold that he recalculated the outstanding premium owed to Ullico by JA Labor using the same months for which Ullico sought reimbursement, November 2010–August 31, 2011. He provided the amended amounts as follows: voided checks $825,388.48; voided checks reduced by 5 percent (adjusted voided) $784,119.06; adjusted voided multiplied by 6 percent yielded a premium of $47,037.14.

### C. Defendants' Arguments

Defendants argued in their summation brief that their criminal conduct (understanding that they both pleaded no contest) involved intentionally misreporting

payroll to obtain a lower insurance premium. As such, defendants' position was that restitution may only be awarded for unpaid premiums attributable to intentionally misreported payroll and only where a "fair" rate multiplier was used. Defendants argued that the only intentional criminal act was the categorization of cleared payroll checks as voided and that the amount of loss relating to this activity was limited to the total of the voided check register, less 5 percent that represents checks that were voided as part of the ordinary course of business. The insurance companies, however, calculated a total payroll report, applied rate factors to determine the premium owed on that amount, and deducted amounts that had already been paid to determine the premium still owed.

In addition, defendants argued that SCIF's representative was unable to describe how the premium had been determined and, therefore, the prosecution failed to provide evidentiary support for count 11. Defendants also claimed that SCIF failed to account for the total amount paid toward their premium, because it credited defendants only $129,167.88, and provided copies of checks paid to SCIF totaling $461,507.

Defendants argued that neither Ullico nor the prosecution had proven that Ullico was defrauded. Juan paid premiums to Ullico based upon the estimate established at the outset of the policy and Ullico never conducted the year-end audit to establish the final amount of the premium. Therefore, defendants never provided Ullico with any false payroll numbers. Furthermore, Juan testified that Ullico agreed to accept $8,000 as the premium owed after canceling the policy.

In response to defendants' argument that the prosecution had not proven that the insurers' lost premiums were caused by defendants' criminal conduct, the prosecutor argued:

> "If I may just clear the record. January 9th, 2018, [Juan] entered no contest pleas to Counts 5 and 8 with *Harvey* waivers; *Harvey* waivers to all other remaining counts on the Indictment. That means that he has—he has admitted guilt but to take advantage of the deal, we agreed to dismiss all of those other criminal charges in order to gain restitution on those matters. So the issue of guilt has already been resolved. He has already admitted

23.

guilt but has taken the benefit of the deal and we've dismissed those charges. So I understand where [defense counsel] is coming from, but we are at a restitution hearing. The issue of guilt … has already been resolved. So I just wanted to clarify that, for the record." (Italics added.)

Defense counsel responded, "I agree."

### D.    Trial Court Ruling

The trial court stated that restitution should make the victims whole and not entitle them to profit but, in this case, "all the insurance agencies when they found that there was underreporting of payroll, they used the maximum amount on the percentages" (referring to the rates assigned based upon the classification codes for employees). The trial court adopted the rate of 6 percent "straight across the board." The trial court also "agreed to discount the voided checks by five [5] percent" as argued by the defense. However, the trial court declined to use "defendants' voided check analysis" because "defendants' conduct on this case does not support a credibility finding … as to the accuracy of their payroll calculations." The trial court used the findings of the insurance company auditors whom "[q]uite frankly, [it] just felt … were more credible." The trial court's calculations are summarized in our chart below:

| Business/Victim/Policy Period(s)/Counts | Total Payroll | Less 5% Discount[39] | Premium (6%) | Outstanding |
|---|---|---|---|---|
| JA Contracting Liberty 6/08–6/09 (Count 5) | $40,879,473 | $38,835,500 | $2,330,130 | $1,924,320 |
| JA Contracting SeaBright 6/09–6/10 (Count 7) | $51,335,667 | $48,768,884 | $2,926,133 | $2,455,357 |
| JA Contracting SeaBright 6/10–4/11 (Count 9) | $33,649,967 | $31,967,469 | $1,918,048 | $1,332,779 |

---

**39**    The trial court determined that 5 percent of total payroll was the amount of checks voided in the ordinary course of business while the figures supplied on defendants' exhibits reduced the total amount of voided checks by 5 percent.

24.

| Business/Victim/Policy Period(s)/Counts | Total Payroll | Less 5% Discount[39] | Premium (6%) | Outstanding |
|---|---|---|---|---|
| JA Contracting SCIF 6/11–9/11 (Count 11) | $5,520,786 | $5,244,747 | $314,684 | $185,517 |
| JA Labor Ullico 2/10–2/11 & 2/11–2/12[40] (Counts 40, 41) | $20,302,625[41] | | $1,218,157 | $1,218,157 |
| Ayalaz Ag Liberty 6/08–6/09 (Count 18) | $6,504,432 | $6,179,211 | $370,752 | $307,922 |
| Ayalaz Ag SCIF 8/10–8/11 (Count 22) | $8,275,781 | $7,861,992 | $471,719 | $361,894 |
| Ayalaz Ag Meadowbrook 8/09–8/10 (Count 20) | $6,425,579[42] | | | $384,380 |

## DISCUSSION

**I.      The trial court did not abuse its discretion in ordering defendants to pay restitution to their workers' compensation insurance companies.**

### A.      Standard of Review and Applicable Law

California crime victims have a constitutional and statutory right to receive full restitution for economic losses suffered as a result of a defendant's criminal conduct. (Cal. Const., art. I, § 28, subd. (b)(13); Pen. Code, § 1202.4, subds. (a)(1), (3)(B), (f).) When a defendant is convicted and sentenced to state prison, "section 1202.4 limits restitution to losses caused by the criminal conduct for which the defendant was

---

**40**      The People provided evidence of audits for each month of both policy periods, not separated by policy period. The trial court's restitution award combined the amounts for both policy periods.

**41**      Because the auditor testified that he used payroll amounts from reports to EDD, the trial court did not discount this amount by 5 percent.

**42**      The trial court did not discount the total payroll because the auditor did not use the value of the total voided checks and used the same rate codes that Ayalaz Ag used.

25.

convicted." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1249; see also *People v. Woods* (2008) 161 Cal.App.4th 1045, 1049 ["Courts have interpreted section 1202.4 as limiting restitution awards to those losses arising out of the criminal activity that formed the basis of the conviction."].) But a different standard applies where a defendant is ordered to pay restitution as a condition of probation. (*People v. Martinez* (2017) 2 Cal.5th 1093, 1101 ["the restitution power conferred by section 1202.4 stands in contrast to a court's power to order restitution as a condition of probation"].)

Section 1203.1 "gives trial courts broad discretion to impose probation conditions to foster rehabilitation and to protect public safety." (*People v. Anderson* (2010) 50 Cal.4th 19, 26.) "California courts have long interpreted the trial court's discretion [under section 1203.1] to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121; see also *Anderson*, at p. 27 ["[t]here is no requirement the restitution order [imposed pursuant to section 1203.1] be limited to the exact amount of the loss in which the defendant is actually found culpable"].) "A trial court's power to order restitution in probation cases is thus broader than its power to order direct victim restitution under section 1202.4 in cases in which the defendant receives a nonprobationary sentence." (*People v. Martinez*, *supra*, 2 Cal.5th at p. 1101.)

"[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) The restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (§ 1202.4, subd. (f)(3).)

26.

At a victim restitution hearing, the People may make a prima facie case for restitution based on the victim's testimony or on some other claim or statement as to the amount of his or her economic loss. (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).) Once the party seeking restitution provides an adequate factual basis for the claim, " 'the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*Ibid.*)

We review the trial court's restitution order for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663 (*Giordano*).) We presume the judgment correct, and to set it aside a defendant must affirmatively show error. (*Id.* at p. 666.) "No abuse of … discretion occurs as long as the determination of economic loss is reasonable, producing a nonarbitrary result." (*Id.* at p. 665.) If the court used a rational method of determining the victim's economic loss, so that the order is not arbitrary or capricious, we will uphold the order. (See *ibid.*; *People v. Garcia* (2011) 194 Cal.App.4th 612, 617.) " ' "If the circumstances reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.' " (*Millard*, *supra*, 175 Cal.App.4th at p. 26.) "In reviewing the sufficiency of the evidence, the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citation.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt." (*People v. Baker* (2005) 126 Cal.App.4th 463, 468–469; see *Millard*, at p. 26.)

**B.** **The Trial Court Did Not Abuse Its Discretion In Determining that Defendants' Criminal Conduct Was Responsible for the Insurance Companies' Lost Premiums and the Amounts of those Losses**

Defendants argue that the prosecution failed to present any testimony during the restitution hearing that defendants intentionally falsified payroll or submitted falsified

27.

payroll amounts to their insurers to generate lowered premiums. Because the prosecution failed to introduce proof that defendants' criminal conduct caused the insurers' lost premiums, defendants argue that the trial court abused its discretion by awarding any restitution. The People argue that it was not required to present evidence of defendants' guilt during the restitution hearing because culpability was established by defendants' pleas of no contest and accompanying *Harvey* waivers. We agree with the People.

A defendant's plea of guilty or no contest "ordinarily includes an admission that there is a factual basis for the plea, and when the plea represents a negotiated disposition—as it did in the present case—the court must satisfy itself that a factual basis for the plea exists." (*People v. Wallace* (2004) 33 Cal.4th 738, 749.) " 'The legal effect of [a no contest plea], to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes.' [Citation.] A guilty plea 'admits every element of the crime charged' [citation] and 'is the "legal equivalent" of a "verdict" [citation] and is "tantamount" to a "finding" [citations].' " (*Ibid*., first & second bracketed insertions added.) By stipulating to the existence of a factual basis for their pleas, defendants cannot challenge the sufficiency of the evidence as to the counts to which they entered pleas. (See *id*. at p. 750.) Their pleas of no contest are " ' "tantamount" to a "finding" ' of culpability for [their offenses]." (*Ibid*.) Juan having pleaded no contest to two felony counts and Alfredo having pleaded no contest to one misdemeanor count, the prosecutor was not required to prove the underlying facts of defendants' fraud as to those crimes.

"In *People v. Harvey* [, *supra*,] 25 Cal.3d [at pages] 758–759[,] our Supreme Court held that facts underlying charges dismissed as part of a negotiated plea may not, absent contrary agreement by the defendant (now called a *Harvey* waiver), be used to impose adverse sentencing consequences. The principle expanded to cover victim restitution [citation] and was soon codified. (Stats. 1988, ch. 287, § 1, p. 989, adding Pen. Code, § 1192.3, subd. (b) ['If restitution is imposed which is attributable to a count dismissed pursuant to a plea bargain, … the court shall obtain a waiver pursuant to

28.

[*Harvey*] from the defendant as to the dismissed count.'].)" (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 678, fn. omitted (*Weatherton*).) "A [typical] *Harvey* waiver permits the sentencing court to consider the facts underlying dismissed counts and enhancements when determining the appropriate disposition for the offense or offenses of which the defendant stands convicted." (*People v. Munoz*, *supra*, 155 Cal.App.4th at p. 167.) Where there is a valid *Harvey* waiver, the prosecution is not required to prove the allegations in the dismissed the counts to establish the victims' entitlement to restitution. (*Weatherton*, at p. 681.) "When the Supreme Court [in *Harvey*] allowed that, with the appropriate waiver, a trial court could take account of 'the facts underlying, and … pertaining to, the dismissed count[s]' [citation], it was clearly authorizing, because of the defendant's personal acquiescence, a sentencing court to take cognizance of such relevant 'facts' as might be shown from the court record." (*Id*. at p. 683.)

Insurance Code section 11760, subdivision (a) provides: "It is unlawful to make or cause to be made any knowingly false or fraudulent statement … of any fact material to the determination of the premium, rate, or cost of any policy of workers' compensation insurance, for the purpose of reducing the premium, rate, or cost of the insurance." Defendants' pleas of no contest establish that they knowingly made false or fraudulent statements of a fact material to determining the premiums for their policies of workers' compensation insurance in order to reduce the premiums.

At a restitution hearing, the prosecution is required to establish the amount of the victim's economic loss, not the criminal conduct underlying the charges. As explained in *Weatherton*, "[r]estitution hearings are intended to be informal" and do not require any particular kind of proof. (*Weatherton*, *supra*, 238 Cal.App.4th at p. 684.) The trial court may accept a property owner's statement made in the probation report about the value of stolen or damaged property as prima facie evidence of loss. (*Ibid*.) " ' " ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.] When the probation report includes

29.

information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount." ' [Citation.]" ' [Citation.] This is invariably a dollars and cents dispute.… [I]t is up to the defendant ' " 'to demonstrate that the amount of the loss is other than that claimed by the victim,' " ' namely, that the amount claimed is excessive." (*Ibid*., third & fourth bracketed insertions added.)

Defendants argue that the trial court could not award restitution unless the prosecution presented direct evidence that defendants intentionally falsified payroll and submitted falsified payroll to generate lower premiums. In his reply brief, Juan acknowledges the Court of Appeal's holding in *Weatherton* that a defendant may not challenge his culpability during a restitution hearing but argues that he only disputed the *amount* of restitution. Alfredo, however, argues that "[i]t sounds as if [the People are] claiming that, if a plea of 'No contest' is entered, any allegation claimed in the Grand Jury testimony is admitted by the Defendant. Defendant/Appellant know[s] of no case law that remotely supports such a position." As we have discussed, *Weatherton*, *supra*, 238 Cal.App.4th at page 684 provides that authority. In that case, the Court of Appeal noted, "Weatherton cites no authority that the prosecution is required to prove the corpus delicti of the dismissed counts, whether by a preponderance of the evidence or other standard, above and beyond what was produced at the preliminary examination." (*Id*. at p. 685.) "While it is one thing to respond that a victim has inflated a claim for restitution, or may even have no claim at all, it is an entirely different matter to assert, as Weatherton does, that while it is undisputed that the victim suffered compensable losses, he bears no responsibility in that there was no crime because he was acting in self-defense." (*Ibid*.)

We reject defendants' arguments to the extent that they would require the prosecution to prove that defendants intentionally reported false payroll amounts to the insurers for the purpose of reducing their premium. Defendants may contest the amounts

of restitution claimed by the victims and whether the claimed restitution is for an economic loss caused by their crimes.

The grand jury testimony established that defendants falsely reported their monthly payroll to the insurers each month, and the insurers' documents that showed the false payroll amounts during the year-end audits were marked as grand jury exhibits. (See *ante*, part II.) Specifically, representatives of Liberty, SeaBright, SCIF, Ullico,[43] and Meadowbrook testified to the grand jury to the amounts of payroll that defendants reported to them and the significantly higher amounts of payroll they found during their fraud audits. Although JA Labor did not submit monthly reports to Ullico during policy period February 2011–February 2012 and Ullico did not conduct a year-end audit, Hill testified that the monthly premiums for that policy period were paid based upon the $300,000 payroll estimate provided at the start of the policy period. Hill's audit of policy period February 2010–February 2011 calculated an actual payroll of $2,907,406. Because JA Labor falsely underreported payroll for policy period February 2010–February 2011 and significantly underestimated its payroll for policy period February 2011–February 2012, the trial court could reasonably conclude the estimate was a false statement made to secure a lower policy premium.[44]

Therefore, defendants' pleas of no contest and accompanying *Harvey* waivers were sufficient to support the trial court's award of restitution based upon defendants' massive underreporting of payroll to the insurers to reduce their policy premiums.

---

**43** Defendants also argue that Ullico failed to present any evidence of intentional misreporting of payroll because it relied upon payroll amounts JA Labor reported to EDD and made no argument that JA Labor falsely reported payroll amounts to EDD. Although we conclude that the insurers were not required to prove defendants' criminal conduct for purposes of the restitution award, we also note that Ramirez did testify before the grand jury that JA Labor underreported payroll to EDD in 2010 by $2,377,899.93 and in 2011 by $11,973,488.32, and both defendants pleaded no contest to one count of tax evasion by false statement.

**44** We also note that that the grand jury evidence showed that JA Labor was involved in disguising its relationship to JA Contracting in order to take advantage of a lower experience modification factor and, by doing so, obtained a lower premium by the use of such lower rate.

**C.** **The Trial Court Did Not Abuse Its Discretion Ordering Restitution Because It Used a Rational Method to Determine the Insurance Companies' Economic Losses**

Defendants' pleas of no contest and accompanying *Harvey* waivers establish that defendants intentionally and falsely underreported their monthly payroll to the insurers to pay lower premiums. Furthermore, the willful underpayment of insurance premiums constitutes an economic loss under section 1202.4.[45] (*People v. Petronella* (2013) 218 Cal.App.4th 945, 968 (*Petronella*), relying upon *U.S. v. Simpson* (6th Cir. 2008) 538 F.3d 459, 462 ["unpaid [workers' compensation] premiums fall squarely within the definition of 'loss' " under federal sentencing guidelines].)

In this case, representatives of Liberty,[46] Ullico, SCIF, and Meadowbrook audited defendants' records, recreated defendants' actual payroll and applied the policy rates, experience modification factors, and state surcharges to determine new premiums. The insurers then reduced the new premiums by the amounts defendants had already paid and arrived at unpaid premiums that would have been charged had defendants not falsified their payrolls. The SeaBright auditor, Robinson, testified to the grand jury that he calculated the actual payroll by combining the payroll included in the monthly reports with the amount of payroll checks that had been voided in the computer. However, Robinson was concerned that the records could not be trusted because they had been altered and he observed indications of other payment types to employees besides payroll. In accordance with the California Workers' Compensation Insurance Manual, Robinson

---

[45] The parties have briefed the restitution issue under the assumption that the trial court ordered restitution pursuant to section 1204.2, subdivision (f). However, as set forth above, section 1203.1 provides the trial court broader discretion to award restitution when defendants receive a probationary sentence. As we ultimately affirm the trial court's restitution order pursuant to section 1202.4, subdivision (f), we do not address whether the order can also be upheld pursuant to section 1203.1.

[46] As discussed above, Liberty calculated an additional $3 million of payroll by reviewing sales invoices and determining that this portion of payroll had been omitted from defendants' monthly totals. (See *ante*, part III.A.1.)

32.

then reviewed JA Contracting's sales records for each month of the policy periods and calculated premiums based upon that business's total sales.[47]

The trial court modified these amounts consistent with two of defendants' arguments. First, the trial court limited the premium rate to 6 percent. Several insurers applied classification codes to the payroll and used the rates established by defendants' policies in the same ratio as reported by defendants. Given that Covian testified that he was instructed to only report a percentage of the total payroll each month and to report greater amounts of payroll in lower rate classifications, the insurers' use of the same classification codes as reported by defendants resulted in lower premium amounts than the insurers would have been entitled to receive had defendants accurately reported their income. As to SeaBright, the auditor selected the highest classification category (and the highest rate) because he could not determine the actual classification categories for the payroll due to defendants' purposeful falsification of their records. Both the policy itself and the California Workers' Compensation Insurance Manual provide for this calculation where the employer has failed to maintain its records.

The trial court, however, found that use of the higher rates unfairly compensated the insurance company. Because defendants failed to maintain correct payroll records showing the payroll classifications, and their fraud caused the records to be unreliable, we do not believe that the trial court would have abused its discretion if it used the insurers' rate calculations. However, the trial court was not required to accept the auditors' rate calculations and did not abuse its discretion in limiting the rate to 6 percent. (See *Petronella*, *supra*, 218 Cal.App.4th at pp. 971–972 [the court could deviate from the regulatory requirements in determining the amount of victim restitution and is not circumscribed by " 'state and federal regulations that require [an agency] to calculate the amount of overpayment according to a different method' "].)

---

[47] (See *ante*, fns. 27–29 [exhibit 2 (previously marked grand jury exhibit 66) used the total sales amounts to calculate the premium].)

The trial court's second adjustment to the insurers' premium calculations was to recognize that while defendants voided hundreds of payroll checks to perpetrate fraud on the insurance companies, some payroll checks were voided in the normal course of business due to error and reissued. To avoid double counting the amount of these checks, the trial court adopted Harold's estimate that 5 percent of total payroll represented the number of checks voided and reissued during the ordinary course of business and reduced some of the insurers' total payroll by this amount.

The methodology adopted by the trial court appears rational and did not produce an arbitrary result. (See *Giordano*, *supra*, 42 Cal.4th at p. 665.) Therefore, we presume the judgments are correct, and to set them aside defendants must affirmatively show error. (*Id*. at p. 666.)

Defendants argue that their case involved underreporting the payroll amounts of their respective businesses to their workers' compensation insurers when they submitted monthly payroll summaries which did not include the amounts of payroll checks that they had voided from their computer system. Narrowly defining their criminal conduct, defendants argue that the economic loss caused by their criminal conduct should be limited to premiums attributable to the total amount of voided payroll checks as reflected in their computer business records. We see several problems with this argument.

First, we do not overturn the trial court's findings just because the circumstances might also support another methodology for calculating the insurers' lost premiums. (*Millard*, *supra*, 175 Cal.App.4th at p. 26.)

Second, defendants' methodology should not result in a different premium amount. For example, if defendants reported $10,000 in payroll (resulting in a $600 premium based upon a rate of 6 percent) and voided $10,000 in payroll checks to avoid paying a premium on that payroll, the insurers' methodology would add the reported and unreported payroll amounts and apply the rate to the total, then deduct the premium that defendants had already paid on the reported $10,000 payroll. The

34.

additional premium would be $600 calculated as follows:  $10,000 + $10,000 = $20,000 x .06 = $1,200 - $600 = $600.  Defendants' method would use only the voided payroll checks and calculate the premium on only the unreported payroll, resulting in an additional premium of $600 calculated as follows:  $10,000 x .06 = $600.

Contrary to expectation, defendants' calculations result in a significantly lower amount of restitution owed to the insurers.  The insurers calculated the premiums owed assuming two categories of payroll, that is, the amount of payroll reported to the insurers and the amount of payroll not reported.  Defendants' calculations, however, assume two categories of unreported payroll—payroll unreported because payroll checks were voided in their system and payroll not reported for unexplained reasons.  Defendants argue that the trial court's restitution awards may only be premised on payroll amounts that were not reported intentionally as evidenced by their exhibits.

Defendants submitted summaries of the monthly payroll and total voided payroll amounts to the trial court (exhibits A–H).  If defendants had reported the total monthly payroll amounts reflected on those exhibits to the insurance companies, then calculating the lost premiums using the voided payroll check amounts would result in the same amounts of owed premium as calculated by the insurance companies.  However, the amounts of payroll reported to the insurance companies were significantly lower than the monthly payroll shown on these records.  For example, JA Contracting reported a total payroll of $6,223,113 to Liberty for June 2008–2009.  According to exhibit A, defendants' records showed a payroll of $18,368,330.73 and a voided payroll check total of $18,934,226.91, which, added together, total actual payroll of $37,302,557.64.  If the trial court only used the voided payroll check amount of $18,934,226.91 to calculate the restitution owed to Liberty, it would omit the premium defendants still owe on the difference between the payroll showing in their records and the payroll reported to Liberty, calculated as follows:  $18,368,330.73 (payroll amount) - $6,223,113 (reported to insurers) = $12,145,217.73.  According to defendants, their criminal conduct was

limited to voiding payroll checks from their computer system and intentionally underreporting payroll only in the amounts reflected in the voided check register. Therefore, the remaining amount of unreported payroll was not the result of intentional fraud and has some other cause that, while defendants may be contractually responsible to pay premium upon, they cannot be ordered to pay as restitution because that portion of lost premium was not caused by their "criminal" conduct.

By the plain language of the statute, the victim's economic loss must come "as a result of the defendant's conduct." (§ 1202.4, subd. (f).) Victims are only entitled to an amount of restitution so as to make them whole, but nothing more, from their actual losses arising out of the defendants' criminal behavior. (*People v. Fortune* (2005) 129 Cal.App.4th 790, 795–796.) However, we reject defendants' attempts to limit their criminal conduct to voiding checks in their payroll system. Defendants' criminal conduct was intentionally reporting less than their actual monthly payroll to lower their insurance premiums. Given defendants' intentional underreporting of payroll, the trial court could have rejected defendants' argument that additional amounts of unreported income had an explanation other than fraud. Additionally, while the evidence presented at the restitution hearing and to the grand jury showed that defendants voided payroll checks so that their computer records would reflect lower payroll amounts during year-end audits, two auditors testified to the grand jury that they saw evidence that defendants concealed payroll in other ways. For example, Robinson (SeaBright) testified that he saw payments to employees that were not recorded as payroll. Johnson (Liberty) compared labor charged on invoices to the payroll records and determined additional amounts of payroll had been paid to employees not reflected in the payroll account. Furthermore, defendants submitted false monthly payroll amounts to the insurance companies unrelated to the voided check register. The grand jury evidence also showed that Covian submitted monthly payroll reports to the insurance companies that reduced actual payroll by a

percentage of the monthly payroll and not based upon any checks voided in the businesses' computer database.

Therefore, we find the trial court did not abuse its discretion in awarding restitution for the total amount of unreported payroll as opposed to limiting the award to the payroll amounts reflected in the voided payroll check register even if it had not rejected defendants' evidence. However, the trial court also rejected defendants' evidence that contradicted the insurers' premium calculations. Harold testified that defendants' exhibits were created from a computer database controlled by defendants and used in their businesses for several years after the district attorney's office returned it to them. The trial court rejected use of defendants' exhibits because defendants had fraudulently altered their business records in committing their fraud, and the court found the records unreliable. " '[T]he trier of fact is not required to believe the testimony of any witness, even if uncontradicted.' " (*Petronella*, *supra*, 218 Cal.App.4th at p. 971.) Given the unreliability of defendants' evidence and the reasonableness of the insurers' calculation of lost premiums, defendants have failed to demonstrate that the amount of the insurers' losses is other than that claimed. (See *Millard*, *supra*, 175 Cal.App.4th at p. 26; *Giordano*, *supra*, 42 Cal.4th at p. 664.)

Juan argues that the trial court abused its discretion in failing to reduce the restitution award to SCIF by additional payments Juan claims had been made to SCIF. Juan argues that the trial court ignored evidence that JA Contracting paid premiums totaling $461,507 to SCIF while SCIF only credited receipt of $129,167.88. Having found Juan's records to be unreliable, the trial court could reject this evidence. Additionally, Juan provided the trial court with his unsigned declaration in support of this argument.[48]

---

[48] Juan's declaration also includes a JA Contracting vendor check report that reflects six payments to SCIF, the latter two for payroll periods in October and November 2011. However, SCIF's premium detail indicates that the policy period was June 2011–September 2011. SCIF

To the extent the scope and nature of defendants' misconduct precludes an exact determination of the insurers' losses, the equities favor the insurers as far as calculating the amount of restitution that is due. (See *Prosser* (2007) 157 Cal.App.4th 682, 691; *People v. Baker*, *supra*, 126 Cal.App.4th at p. 469.) After reviewing all the relevant considerations, we are satisfied there is a factual and rational basis for the trial court's restitution order. No abuse of discretion or other ground for reversal has been shown.

## DISPOSITION

The judgments are affirmed. The trial court is directed to prepare an amended sentencing minute order to reflect the vacatur of the $250 presentence investigation report fee as to Juan.

HILL, P. J.

WE CONCUR:


POOCHIGIAN, J.


DETJEN, J.

---

credited JA Contracting with $129,167.88, which was the total of the August and September 2011 check amounts indicated on the vendor check report.